ARTHUR CONATY, Receiver *vs.* LOUIS TORGHEN *et al.*

MARCH 26, 1925.

PRESENT: Sweetland, C. J., Stearns, Rathbun, Sweeney, and Barrows, JJ.

BARROWS, J. This is an action of trespass on the case for negligence brought by the receiver of an insolvent corporation against three of its officers jointly, Torghen as President, Blistein as Treasurer, and Friedman as Secretary. The case was tried to a jury and at the conclusion of the evidence the court denied defendants' motion and granted that of plaintiff for direction of a verdict. Defendant Blistein alone pressed exceptions to the action of the trial court on both motions.

The first and only count of the declaration with which we are now concerned avers the incorporation in 1907 of the Workingmen's Gemilath Chessed Association for the mutual

assistance of its members; that its assets consisted exclusively of weekly cash deposits by members; that loans were to be made to members only and by check jointly signed by three officers, the president, secretary and treasurer; that business periods called "cycles" covered two years and at the end of each cycle a distribution took place of all funds accumulated. The count further alleges that payments made as above were to be deposited in a proper bank or lent to members in accordance with the rules and states the wrongful act of the officers to have been that they "failed to examine the corporate activities of each other in collecting, depositing or lending the money" and "so carelessly and fraudulently mismanaged" corporate affairs as to show a loss of $18,000 in the cycle between October 1918 and October 1920.

The evidence showed that in 1909 Friedman became secretary that thereafter he substantially was in sole control of the corporation; the society became commonly known as "Friedman's money society"; no meetings of the corporation were held; no officers were elected; no written by-laws or rules existed. There is nothing in the evidence to show whether meetings ever had been held, officers elected or by-laws or rules adopted by the corporation. Some rules as to loans and withdrawals were promulgated by Friedman alone and printed in members' pass books. The rules were followed or not as he saw fit. Decisions as to whom loans should be made came from Friedman without consulting anyone.

Friedman from time to time designated two other members to act as president and treasurer, respectively. Their only active duty appears to have been to sign checks, signatures of three officers of the society being required by the Westminster Bank in which the funds were deposited. If the scheme of lending were strictly followed the society would have had at all times sufficient funds on hand to make the loans for which members were entitled to ask and, as all loans were admittedly paid, the society would not have been

450

insolvent without negligence or worse on the part of those responsible for its funds.

In the cycle from 1916 to 1918 Blistein was named President by Friedman and was a joint signatory to all checks. In the cycle starting in October, 1918, one Hodosh was Treasurer until October 28th, at which time Friedman told Blistein to act as Treasurer and appointed defendant Torghen as President. None of the officers received compensation for their services and the president had no supervision of the collecting of dues or management of the society. His only function was to sign checks with the treasurer and secretary. The collection and depositing of dues was substantially all done by Friedman. Vouchers at the end of each month were returned to Friedman and never seen by others. We are not, however, concerned with the deposits for the receiver's present claim, as stated by his counsel in argument, concerned only money which actually got into the bank and out again on checks jointly signed by all three officers.

All shareholders during the cycle 1916–1918 received full repayment in October of the latter year. It is not clear, however, that these payments were made entirely from member's dues paid during that cycle.

During the following cycle with which the declaration deals there is some evidence of a forged note for $1,300 and of at least one forged check for $200, but most of the checks issued are shown on Friedman's book. Some of the cancelled checks have disappeared and Friedman claimed he was unable to produce them. A statement from the Westminster Bank of the deposits and checks drawn from October 7, 1918, to October 22, 1920, was presented in evidence. There is some dispute whether this statement shows individual checks or in some instances only total withdrawals on the date indicated. It does not show who the payees were. The statement shows, among payments made by the bank, the following: October 14, 1918, $484.12; same date, $229.12; same date, $5,242.69; October 17, $1,038.25;

November 13, 1919, $2,345.44; December 1, 1919, $2,300.60; April 29, 1920, $2,001.55. Checks for these payments have not been produced by Friedman nor do his books show to whom they were payable. It is significant, however, that the 1916–1918 cycle ended Sunday, October 6, 1918, and that according to the usual course of business checks for distributive shares would be passed out to members on Sunday, October 13. It was therefore possible that the payments shown by the bank on October 14, and 17 were legitimate payments on account of the preceding cycle.

Business continued as usual from October, 1918 to October, 1920. Friedman then, as in former cycles, figured the amount due to each shareholder for the cycle just closing and brought the checks to Blistein and Torghen for their signatures. The checks were signed and distributed, about October 13, 1920, and after a few had been paid the balance began to come back from the bank marked "no funds." Among such dishonored checks Blistein and his immediate family held nearly $3,400 worth. About this time Friedman disappeared for a few days. He was in New York but for what purpose he refuses to state on the ground that it might incriminate him. On his return, about October 20, at a stormy meeting of the shareholders at which Blistein was present, Friedman told them that he had used the society's money to buy stock and that he had "gambled it away like a drunken sailor," but that if they would give him time he would try to pay it all back and see that no one lost anything. Then followed the receivership and by stipulation at the outset of this trial the amount of the claims filed by members with the receiver was agreed upon as the loss which the corporation had suffered. These total $12,935.50.

The theory upon which the trial court acted was that the evidence showed that at least $12,935.50 had been paid to the corporation, had been placed in the bank and could only have been withdrawn by the joint signatures of all three officers; that said defendants were *de facto* officers; that the money had been withdrawn and that as no testimony

showed to whom it had gone, a *prima facie* case was thereby made out against defendants; that the burden of proof was upon the officers to explain its disappearance and that they having failed to so do, joint gross negligence must be inferred against all and a verdict directed for plaintiff for the amount of loss to the corporation.

We think the court was correct in holding the defendants to be *de facto* officers of the corporation but it does not follow that a verdict should have been directed. In a negligence case a directed verdict for plaintiff is something of a rarity. Some courts refuse ever to so act on oral testimony, holding that the weight of evidence is always in the first instance for the jury. 26 R. C. L. p. 1074, § 79. The test as to whether a verdict should be directed has been laid down by this court, speaking through Durfee, C. J., in *Clarke* v. *R. I. Electric Lighting Co.*, 16 R. I. 463, at 466. It is, "Whether the facts be disputed or not, if they are such that different minds, fairly considering them, might draw different conclusions from them, the question of negligence is for the jury." In this case, therefore, the real test in passing upon the correctness of the action of the trial justice in directing a verdict for the plaintiff is whether on the evidence the only reasonable conclusion was that all three defendants were jointly liable for the shortage.

The basis of liability for negligent acts of directors or officers of a corporation is neglect of duties imposed upon them. *Briggs* v. *Spaulding*, 141 U. S. 132; *North Hudson Bld'g. & Loan Association* v. *Childs et al.*, 82 Wis. 460. The question is also very fully discussed in *Campbell* v. *Watson*, 50 Atl. 120. No distinction exists between the liability of officers or directors. Fletcher on Corporations, Vol. 4, § 2445. The first of the above cases is recognized as one of the leading authorities. The court there held that directors acting gratuitously were not liable for negligence unless a want of good faith could be imputed to them and that each case must be decided upon its own facts. In the second of the above cases the directors for five years had abdicated

their functions and left the entire management to the president, secretary and treasurer. Of the latter officers, the secretary took entire control into his own hands and dissipated some of the corporate funds. The president and treasurer acted in perfect good faith and received no personal gains. The function of the treasurer was described as purely ministerial and he had accounted for and paid over to the secretary every cent which he received. The court held that the treasurer was liable only for his own negligence or such negligence as all participated in.

The liability may exist though the officers receive no compensation but the fact of gratuitous service should be considered in determining. the existence of negligence. 4 Fletcher on Corporations, § 2444. There is much discussion in the cases about gross negligence which is not defined: whether negligence is to be tested by a man's care in his own affairs, or only by the conduct of the average prudent man; how far the elements of wanton and wilful misconduct are necessary. 4 Fletcher on Corporations, quoting Morawetz, in § 2447 says: "What constitutes a proper performance of the duties of a director is a question of fact which must be determined in each case in view of all the circumstances; the character of the company, the condition of its business, the usual method of managing such companies and other relevant facts must be considered."

A fair summary of the decisions is that an officer is liable for want of reasonable care, giving due consideration to the nature of the corporate business, his own particular duties and the time, place and circumstances in which he is expected to perform them. If lack of reasonable care exists he is liable for losses occurring as a proximate result of such lack. 4 Fletcher on Corporations, p. 3776, § 2537; 7 R. C. L. 479.

In the case at bar no by-laws existed and the treasurer, as shown by the evidence, performed only two duties: one to check up the Sunday morning collection of dues with the secretary, and the other, to sign checks for the withdrawal of funds from the bank. The evidence does not show any

negligence in regard to the first of these. Only upon the second is there a claim made of joint negligence. If checks were signed for purposes which the signers knew or ought by due care to have known to be improper and if their payment resulted in loss to the society, the defendant was liable as one of the joint signers. The evidence relating to the checks before referred to does not disclose the payees. While it is true that Blistein says he signed any check which Friedman told him to without looking at it, the conclusion is by no means certain that such checks were made payable to or actually paid to an improper person or for an improper purpose. It is entirely within the possibilities that the checks in October, 1918, may have been drawn to secure cash which was used to pay off members who had completed their payments for the cycle of 1916 to 1918. It certainly can not be said as a matter of law that these checks were joint misappropriations. The other checks not explained may have been properly drawn to Friedman to use for legitimate purposes of the society and if so his subsequent misappropriation unknown or not reasonably to be known by Blistein could not render Blistein a joint tort feasor. At least one $200 check with Blistein's signature was testified to as a forgery. The facts that Blistein knew nothing of the shortage until after signing the checks for the distributive shares in October, 1920, and that his duties as performed never took him to the bank for statements or to deposit money and that of the dishonored checks he held about $3,400 worth, either directly or through indorsement, were circumstances from which reasonable men might have declined to find him a joint wrongdoer with Friedman. It was perhaps an open question whether Blistein ought to have kept closer track of the bank account. Of course he could not claim immunity for checks signed without inquiry by him and made payable to those to whom the society could under no proper circumstances pay money. 4 Fletcher on Corporations, § 2443 suggests that if the test of liability is reasonable care the question must generally go to the jury

because every man determines such a question by referring to his own experiences and observations; that consequently, even without a conflict of testimony, the question must go to the jury unless the only inference from the facts to be made by reasonable men is that the officers were negligent in the performance of their duties. The question should be looked at from the point of view of both officers and shareholders and in the light of events as they arose, not as shown in the resultant outcome. The officer's personal danger of losing his contributions is a factor to be weighed in determining whether his conduct was negligent.

In view of the loose way the business of the corporation had always been conducted, the sole control which had been conceded to Friedman by the members, their general lack of interest in the corporate management, and of the fact that Blistein's, or any other member's, first knowledge of the shortage was after the checks for the distributive shares were dishonored, in October, 1920, we think that the question of Blistein's joint negligence was one upon which the jury should have been allowed to pass.

Having reached this result there remains the problem as to the extent of the new trial. This court early took the common law view that joint parties stand or fall together unless some are exonerated, as occurred in *Grinnell* v. *Marine Guano and Oil Co.*, 13 R. I. 135 and *Grundy* v. *Hadfield*, 16 R. I. 579; that appellate action by one alone after a joint verdict would not be permitted. *Curry* v. *Stokes*, 12 R. I. 52; *Bassett* v. *Loewenstein*, 22 R. I. 468, same case 48 Atl. 589; *Bassett* v. *Loewenstein*, on reargument, 48 Atl. 934; *Winsor* v. *Cook*, 35 R. I. 472. These cases rest upon the sound proposition that appellate proceedings involve the whole case and can not do so when one only of the persons jointly interested is before the court. The court recognizes one exception, viz., where one of two defendants has been found not guilty. In such case the defendant found guilty could appeal and in that event the liability of the latter alone was involved. *Martin* v. *Walter*, Exceptions No.

2266, not reported but referred to in *Bassett* v. *Loewenstein*, 22 R. I. at 470.

The harshness and possible injustice of this doctrine particularly in tort cases is set forth in *J. Samuels & Bro.* v. *Superior Court*, 41 R. I. 100, wherein the early strictness was relaxed and each of two joint tort defendants against whom a verdict had been rendered was allowed to file a motion for a new trial. While the court therein stresses the fact that both defendants had filed motions for new trials and calls attention to certain distinguishing features in the earlier cases, we think it must be conceded that the later case is a departure, though not an unjust one, from the earlier holdings. The court recognizes that the defences of several alleged joint tort feasors may differ; that different attorneys may appear for each party and different exceptions may be taken and that the logical corollary is that each person should be permitted separately to move for a new trial. It further interprets our statute (now G. L. 1923, Chap. 348, Sec. 12 (5120) ) as permitting such procedure. The result attained is the same as that from the course suggested in the earlier Rhode Island cases of having the single defendant file his appeal "in the name of all." It represents greater consideration for substance than for form. The case allows the filing of separate motions for a new trial by each defendant after a joint verdict when all defendants acting independently have filed such motions. We see no good reason if the individual is to be protected why the same practice is not proper even if less than all defendants have filed such motions. If each defendant separately may file a motion for a new trial it must follow that each is entitled to be heard in this court on exception to refusal to grant such motion.

It does not follow, however, that upon the granting of one motion for a new trial or sustaining exceptions the new trial must be limited to the one party appealing. From the nature of the case this may be impossible. Plaintiff here has chosen to bring an action against all jointly and this

court can not and will not attempt to alter the form of his proceeding. It may, however, properly say to him that he must pursue his case against all parties jointly. The exceptions presented in the present case purport to be reasons why a verdict should be directed for defendant Blistein or why one should not have been directed for the plaintiff. If we had taken the former view his co-defendants might not have been interested. As we have adopted the latter a new trial must be granted to all if justice is to be done. The error committed by the trial court was fatal to the entire verdict. The verdict is a unit. *Patterson* v. *Standley*, 91 Ill. App. 671. Damages for a joint tort can not be apportioned among defendants found guilty. 38 Cyc. 492. The inquiry is not who ought to pay but how much damage the plaintiff has suffered from the jointly wrongful act. *Halsey* v. *Woodruff*, 9 Pick. 555; *Beal* v. *Finch*, 11 N. Y. 128. Although our attention has been called to this error only by the exception of Blistein it affects his co-defendants as fatally as Blistein. It vitiates any verdict against the three defendants. The verdict can not be claimed to have ripened into a judgment against the two defendants not prosecuting the exceptions because Blistein's rightful prosecution of the exceptions stayed the entry of judgment on the verdict. G. L. 1923, Chap. 348, Sec. 18 (5126). We feel constrained, therefore, to hold that the exception sustained at the instance of one defendant alone upon grounds equally affecting all defendants must be held to carry the case back for a retrial of the joint liability of all. Such was the course adopted in *Patterson* v. *Standley, supra.*

The exception of defendant Blistein to the refusal of the trial court to direct a verdict in his favor is overruled. His exception to the granting of plaintiff's motion to direct a verdict is sustained. The case is remitted to the Superior Court for a new trial of Blistein, Torghen and Friedman, both on the question of joint liability and damages.

*Comstock & Canning, Edward M. Brennan, William A. Graham*, for plaintiff.

*Cooney & Cooney, George Helford*, for defendant Blistein.