DECISION
This matter is before the Court for decision following a bench trial. The dispute is between the Plaintiffs, limited partners (Limited Partners) of Quaker Towers Associates (QTA or Partnership), and Defendant Kelly Picerne, Inc. (KP or General Partner), the general partner of QTA. The Limited Partners allege that KP breached the terms of the parties' written Limited Partnership Agreement (LP Agreement) by failing to make annual distributions and unjustifiably withholding the Limited Partners' respective shares of the $285,000 remaining from the sale of Quaker Towers in 2004. Additionally, the Limited Partners claim that KP breached its fiduciary duties of care and loyalty by engaging in self-interested transactions, favoring the interests of its corporate parent — Picerne Investment Corporation (PIC) — over QTA and the Limited Partners, and failing to adequately manage and maintain Quaker Towers. As a result, Plaintiffs seek (1) a full accounting of the amounts due to the Limited Partners under the LP Agreement; (2) an order and judgment in favor of the Limited *Page 2 
Partners granting the full amounts due under the LP Agreement; (3) actual and consequential damages proximately caused by KP's breaches of contract and fiduciary duties; (4) a judgment and order disgorging KP of its secret profits and proceeds obtained in violation of its fiduciary duties; (5) a declaration of the rights of the Limited Partners to share in distributions provided for in the LP Agreement; and (6) an award of attorney's fees under G.L. 1956 § 9-1-45 and the costs of suit.
 I Facts and Travel
On March 30, 1977, the Limited Partners and KP entered into the LP Agreement creating QTA. See Pls.' Ex. 1. The purpose of the Partnership was to (1) acquire the parcels of real estate known as Quaker Tower Apartments (Quaker Towers or Property), and (2) "to hold, own, improve, operate, manage, service, lease, mortgage and encumber the same . . . and to acquire additional real and personal property to the extent necessary or appropriate to carry out the foregoing purpose." Id. KP is a Rhode Island corporation and wholly owned subsidiary of PIC.[1] (Tr. 25.) KP is one of the largest apartment managers in the country, managing between twenty-five and fifty apartment properties in Rhode Island alone.Id. QTA's original limited *Page 3 
partners included Eustace Pliakas, Leon Cornell, David Friedman, William Vican, Sr., Constantine Georas, Nicholas Goluses, Sr., Glenn Capalbo, David Bolton, and Louise Durfee.[2] (Pls.' Ex. 1.)
Quaker Towers was constructed in 1972 and was purchased by QTA in 1977 for approximately $1,600,000. See Pls.' Ex. 1; Tr. 26-28. Quaker Towers is a 128-unit apartment complex comprised of seven residential buildings and a small commercial building on about six acres. Id. The Property is located on Cowesett Avenue in West Warwick, Rhode Island. Id.
 The LP Agreement
In accordance with the terms of the LP Agreement, the Limited Partners contributed a total of $200,000 in exchange for a fifty-percent interest in QTA, and KP contributed $10 in exchange for its fifty-percent stake. See Pls.' Ex. 1; Tr. 32. As the sole property manager of Quaker Towers from 1977 until its sale in 2004, the LP Agreement entitled KP to an annual management fee equal to five percent of the gross income actually received from rents.[3] Id. ¶ 15.1; Tr. 26.
In addition to the initial capital contributions, the LP Agreement required the General Partner to make loans to the Partnership in the event it incurred an annual operating deficit or annual negative cash flow in the years before 1983. Id. ¶ 11.2. These loans, known as "Class A *Page 4 
loans," were to be repaid to the General Partner without interest before the distribution of any available net income.[4], [5]
Once all Class A loans had been repaid, the LP Agreement specified that income and losses were to be shared by the General Partner and Limited Partners, and the available net income was to be distributed "not less often than annually." Id. ¶ 9. The LP Agreement provided that available net income was to be distributed as follows: (1) "all of the available net income for each year up to $18,000 shall be distributed on a non-cumulative basis to the Limited Partners . . ."; (2) "[a]ll of the available net income for each year in excess of $18,000 and up to $36,000 shall be distributed on a non-cumulative basis to the General Partner"; and (3) "[a]vailable net income for each year in excess $36,000 shall be distributed to the partners (Limited and General), without priority. . . ."[6] Id. ¶¶ 9.1-9.2. *Page 5 
As General Partner, KP was entrusted with management and control of the Partnership.
The LP Agreement provided that
 "[t]he management and control of the [P]artnership business shall be exercised, and all decisions to be made by the [P]artnership shall in all cases be made, by the General Partner. Limited Partners may not exercise any voice or control in the management of the [P]artnership business or bind the [P]artnership in any way whatsoever." Id. ¶ 14.1.
Among the powers granted to the General Partner, the LP Agreement authorized KP to
 "sell or exchange all or any part of the [P]artnership property and assets . . .; to acquire and accept, by purchase or otherwise, real property or any interest therein for the [P]artnership . . .; to enter into contracts for construction and equipping of, and to cause to be constructed and equipped, any building or buildings and/or improvements on real property or leasehold or other interests . . .; to demolish any building owned or leased by the [P]artnership after the General Partner has made all Class A and Class B loans . . .; and to erect a new building in its place and/or alter or improve any building owned or leased by the [P]artnership; to obtain loans, secured and unsecured, for the [P]artnership and to secure the same by mortgaging, assigning for security purposes, pledging or otherwise hypothecating all or any part of the [P]artnership property or assets . . .; to prepay in whole or in part, refinance, recast, increase, modify or extend any such mortgage, security, assignment, pledge or other security instrument, and in connection therewith to execute, for and on behalf of the [P]artnership, any extensions, renewals or modifications thereof and any new mortgage, security assignment, pledge or other security instrument in lieu thereof; and to take all other action and to execute any and all other contracts, documents, and instruments it may deem appropriate to carry out the intents and purposes of this Agreement; provided, however, that nothing contained in this paragraph shall increase the liability of the Limited Partners as herein stipulated." Id. ¶ 14.2. *Page 6 
In addition to the specific powers enumerated in ¶ 14.2, the LP Agreement authorized the General Partner to exercise all of the "rights and powers of a general partner provided under the laws of the State of Rhode Island."[7] Id. ¶ 14.3.
KP's liability was also limited by the LP Agreement which provided that
 "[t]he General Partner shall not be liable, responsible or accountable in damages or otherwise to any of the partners for any acts performed by it within the scope of the authority conferred on the General Partner by this Agreement or for its failure or refusal to perform any acts except those expressly required by the terms of this Agreement." Id. ¶ 15.4.
Additionally, as part of its management power, KP was authorized to "employ, on behalf of the [P]artnership, such persons, firms or corporations as it in its sole judgment, shall deem advisable in the operation and management of the business of the [P]artnership. . . ." Id. ¶ 15.3.
Under the LP Agreement, KP also reserved the right to engage in "any other business or investment, including the ownership of or investment in real estate and the operation and management of real estate." Id. ¶ 15.2. The LP Agreement also ensured that "neither the [P]artnership nor any of the partners thereof [had] any rights in and to" any such business, investments, or income and profits derived therefrom. Id.
In contrast, the terms of the LP Agreement prohibited the Limited Partners from exercising any "voice or control in the management" of the Partnership. See Id. ¶ 15.6. In exchange for relinquishing management and control to the General Partner, the Limited Partners were shielded from personal liability. Id. The LP Agreement stated that the Limited Partners *Page 7 
"shall not be personally liable for any of the debts of the [P]artnership or for any other losses thereof beyond the amount of [their] interest in the [P]artnership." Id.
 Management and Operations
KP managed Quaker Towers as part of its West Warwick Package (Package), a collection of seven different apartment projects in the area. (Tr. 49-50.) The Package consisted of Quaker Towers, River Run, Pleasant Hill, Maple Leaf, Shady Oaks, Pilgrim Park, and Parkview Terrace.[8] Id. These projects were managed, at least in part, by PIC employees at PIC's corporate office located on Lambert Lind Highway. Id. Additionally, all of the employees who were assigned to properties within the Package, worked out of an office located at Quaker Towers.Id. at 74.
As part of this arrangement, KP allocated and shared many of the costs and expenses it incurred across the Package, while others were charged directly to certain properties. Id. Among those shared expenses, employee payroll was allocated on a weekly basis at the Lambert Lind Highway corporate office. Id. at 90. These allocations were not made based on the submission of time sheets by employees, but instead allotted according to the estimated amount of an employee's time that was apportioned to a particular property within the Package.[9] Id. at 49-50, 90-98. In making payroll allocations, the goal was to ensure that on a per unit basis the *Page 8 
allocation of employee costs (which included payroll expense, employee taxes, benefits and employee apartments) was equitable across the Package.[10] Id. at 1283-85; Def.'s Ex. L.
Employee transportation reimbursements — including mileage and the cost of gasoline — were also allocated across the Package by the corporate office. Id. at 52. Although it was not a written corporate policy, transportation costs were allocated in the following manner: (1) the first two weeks of each month were charged to Quaker Towers; (2) transportation costs for the next two weeks of each month were charged to Shady Oaks; and (3) in the event that there was a fifth week in the month, transportation costs were charge to one of the other properties within the Package.Id. at 53, 1212-13. During the period 1998 through September 2004, QTA's travel and transportation expenses were $2,693 in 1998; $3,137 in 1999; $6,270 in 2000; $6,258 in 2001; $5,325 in 2002; $5,731 in 2003; and $4,226 in 2004.See Pls.' Ex. 7.
Generally, employee apartments were also considered part of an employee's compensation. Under this system, QTA allowed its employees to occupy apartments at Quaker Towers. (Tr. 105-07.) QTA then covered the cost of the full rental rates for these apartments, and debited those employees' salaries for a fraction of that charge.Id. In addition, QTA employees were allowed to live at other properties within the Package, and QTA was charged for the rental cost of the units occupied by those employees. Id. For those employees whose time was not entirely assigned to Quaker Towers, the actual expense charged to QTA reflected the estimated amount of time the employee was assigned to Quaker Towers. Id. at 1249; Def.'s Ex. K. *Page 9 
Similarly, expenses such as employee benefits and bonuses were not allocated equally across the Package. Employee benefits were charged to the property where the employee was assigned or filling a vacant position, and employee bonuses[11] were based on the performance of the specific property. Id. at 92, 104, 1295.
Quaker Towers also incurred numerous other expenses that were charged directly to QTA. In 2001, KP purchased a pick-up truck.Id. at 1213, 1245. The truck was required for rubbish removal, snow plowing, landscaping, and transporting appliances, furniture, and equipment. Id. at Tr. 556-57, 1213, 1329-30. Although the truck was sometimes used for snow removal at other properties within the Package, it remained at the Property ninety-five percent of the time.[12] Id. at 1245. Although KP charged the entire purchase price of $29,953 to QTA, over the course of QTA's ownership of the truck, QTA and the Limited Partners obtained a tax benefit by depreciating it as an asset. Id. at 101, 551-52. Additionally, KP charged the Partnership for the cost of insurance on the three other trucks owned by properties within the Package. See Pls.' Ex. 58.
QTA also incurred computer fees and maintenance expenses. QTA's computer fees included: (1) total monthly service fees paid to Verizon for 56K frame relay leased lines and T-1 lines for internet access; (2) total monthly equipment fees paid to Studebaker-Worthington Leasing Company for the leased equipment needed for internet access; and (3) installation fees paid to Verizon Electro Standards for installation of the T-1 lines.See Def.'s Exhibit N. For *Page 10 
the period of 1999 through September 2004, QTA's computer fees were $946.34 in 1999; $2,989.58 in 2000; $2,655.57 in 2001; $3,287.02 in 2002; $4,455.40 in 2003; and $2,534.93 in 2004.Id.
QTA's computer maintenance fees included: (1) computer maintenance; (2) Dell computer leasing; and (3) Yardi licensing fees.[13] See Def.'s Ex. O. For the period of 1999 through September 2004, QTA's computer maintenance fees were $3,000 in 1999; $3,000 in 2000; $3,000 in 2001; $4,575 in 2002; $5,100 in 2003; and $2,727.59 in 2004. Id.; Tr. 110-11.
QTA also incurred audit fees paid to Ernst Young. (Tr. 537.) During the period of 1998 through 2005, the Partnership's audit fees were $8,900 in 1998; $10,600 in 1999; $10,600 in 2000; $12,305 in 2001; $11,565 in 2002; $16,795 in 2003; $14,244 in 2004; and $22,511 in 2005. See Def.'s Exs. S T.
Although many apartment projects had begun the transition to low-flow toilets — which many deemed to be more cost-effective — they were not installed at Quaker Towers during the period of 1998 through September 2004. (Tr. 167-68.) For this period, QTA's water and sewer expenses were $39,651 in 1998; $46,233 in 1999; $49,540 in 2000; $45,000 in 2001; $60,168 in 2002; $59,649 in 2003; and $44,096 in 2004. See Def.'s Ex. 7.
In certain instances, KP contracted with or obtained services from affiliates of KP or PIC. KP contracted with the Picerne Family Trust to provide coin-operated laundry services to the Property. (Tr. 67-68.) Under the terms of its agreement, gross laundry income generated at Quaker Towers was split 50/50 between QTA and the Picerne Family Trust. Id. at 530. During the period of 1998 through September 2004, the Partnership earned laundry income of $1,920 in *Page 11 
1998; $5,798 in 1999; $6,444 in 2000; $5,980 in 2001; $6,942 in 2002; $6,571 in 2003; and $3,410 for the partial year of 2004. See Pls.' Ex. 7.
In addition to laundry services, during the period of 2001 through 2004, QTA's cable services were provided by Starlight Communications (Startlight), a company owned by officers and employees of KP and PIC.[14] (Tr. 60.) As part of this arrangement, Quaker Towers provided basic cable service at no charge to its tenants, and then paid Starlight for that service.Id. at 61.
Furthermore, Quaker Towers' property insurance coverage was brokered by Kelly Picerne Insurance. Id. at 57-58. Capital improvements such as painting, roofing, and water repair were performed at Quaker Towers by KP Management, a PIC-owned company.Id. at 54. IT services were provided to Quaker Towers by WebeConsulting, Inc., a company also owned by individuals with an ownership interest in PIC. Id. at 109. Finally, a KP-owned furniture rental company rented furniture to tenants of Quaker Towers and KP's furniture division purchased, among other things, air conditioners and HVAC units that were then installed at Quaker Towers. Id. at 70, 110.
 Financing the Property
As part of its acquisition of Quaker Towers in 1977, QTA obtained mortgage financing from Old Colony Cooperative Bank (Old Colony).Id. at 30-31. In 1987, QTA refinanced this mortgage with the Bank of New England (BNE) with a seven-year term loan in the amount of $2,600,000.[15] Id.; Pls.' Ex. 17. A portion of the proceeds from the refinancing was used to *Page 12 
satisfy the outstanding balance of the Old Colony mortgage, a portion was used to satisfy various loans and advances owed to KP as general partner, and the remainder was distributed to the General Partner and Limited Partners in accordance with ¶ 10 of the Agreement. Id. at 30-31; Pls.' Ex. 45.
In 1991, BNE encountered financial difficulties and was declared insolvent.[16] Id. at 966-68; Managing the Crisis 639-42. As a result, the Federal Deposit Insurance Corporation (FDIC) was appointed receiver and took over BNE's loan portfolio. Id.
Subsequently, BNE was marketed for acquisition, and Fleet National Bank (Fleet) was chosen to acquire BNE. Id. Fleet entered into an interim agreement to manage BNE until the transaction was consummated and also agreed to service BNE's problem assets.Id. To manage these assets, Fleet established a wholly-owned subsidiary, Recoll Management Corporation (Recoll). See
Managing the Crisis 643-44.
In 1992, QTA had approximately $2,500,000 in outstanding debt with BNE.[17] In light of Fleet's acquisition of BNE, QTA began negotiations with Fleet to refinance its existing BNE debt that was currently managed by Recoll.[18] Id. at 969-72. As part of the 1992 transaction, *Page 13 
Fleet loaned QTA approximately $1,496,000 in new funds to satisfy part of its BNE indebtedness, and the remaining $1,070,000 of the original 1987 BNE promissory note remained with and was subordinated by Recoll (hereinafter, Recoll Note).[19] See Pls.' Exs. 19-20; Tr. 969-72. The Fleet and Recoll Notes were each respectively secured by a guaranty by PIC and a mortgage and security interest in all real and personal property owned by QTA.Id.
In 1995, Recoll announced that it was interested in selling its portfolio, which included the Recoll Note. (Tr. 973.) After several months of preparation, a bid of approximately $550,000 was submitted to Recoll by PIC.[20] Id. at 977. PIC's bid was accepted, and on September 21, 1995, PIC and the FDIC executed a Non-Recourse Assignment Agreement which assigned the Recoll Note to PIC in exchange for $550,000.[21] See Pls.' Ex. 23; Tr. 113, 978. *Page 14 
After acquiring the Recoll Note, PIC restructured its terms and caused QTA to pay only five-percent interest. (Tr. 979-80.) As a result, any principal payments and interest above five percent accrued as a liability of QTA.[22] Id.
A July 2002 refinancing with Fleet was also a combined transaction by QTA, PIC, and several PIC affiliates. See Pls.' Ex. 27. The refinancing consisted of a total loan amount of approximately $21,000,000. As it pertained to QTA, the July 2002 refinancing was an amendment and restatement of the existing Fleet loan which had an outstanding balance of $1,323,310.14.[23] See Pls.' Ex. 28. According to the terms of the refinancing, the new loan term was for five years with a two-year extension option. Id. Additionally, PIC unconditionally guaranteed the loan and Quaker Towers served as collateral. Id.
In December 2002, KP went through an additional refinancing. As part of this transaction, KP refinanced the subordinated $1,070,000 Recoll Note with Citizens Bank (Citizens).[24]See Pls.' Exs. 30-33. As part of the refinancing, QTA obtained approval for a $2,530,000 first loan and mortgage which was guaranteed by PIC. Id. In order to pay off Fleet and PIC, KP needed approximately $2,448,000, of which approximately $1,140,000 was used to repay PIC for the Recoll Note.[25]See Pls.' Ex. 33. *Page 15 
 Sale of Quaker Towers
In 2003, KP engaged Stephen Witten of Marcus Millichap, a real estate brokerage firm, to sell Quaker Towers.[26]
(Tr. 164; Pls.' Ex. 54.) The Property was sold for $6,200,000 in September 2004 to an unrelated entity.Id. at 37, 166, 174-75; Pls.' Ex. 5. Following the sale, a portion of the proceeds were set aside by KP as a reserve fund to cover unexpected contingencies and unforeseen expenses in winding up the Partnership.[27] See Pls.' Ex. 5.
 II Standard of Review
The court decides non-jury trials pursuant to its power under Rule 52, which provides that "[i]n all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon." Super. R. Civ. P. 52(a). Under Rule 52, "the trial justice sits as a trier of fact as well as law." Parella v. Montalbano,899 A.2d 1226, 1239 (R.I. 2006) (quoting Hood v. Hawkins,478 A.2d 181, 184 (R.I. 1984)). As a result, the trial justice "weighs and considers the evidence, passes upon credibility of the witnesses, and draws proper inferences" from the evidence presented.Id. Furthermore, an extensive analysis and discussion of the evidence and testimony is not required to comply with the mandates of Rule 52; rather "brief findings and conclusions are sufficient if they address and resolve the controlling *Page 16 
and essential factual issues in the case." Hilley v.Lawrence, 972 A.2d 643, 651 (R.I. 2009) (quoting Donnelly v.Cowsill, 716 A.2d 742, 747 (R.I. 1998) (citation omitted)).
 III Discussion A Motion to Strike Plaintiffs' Expert Testimony
When a subject of a scientific, mechanical, professional, or technical nature is before the court, a witness who possesses special knowledge in such an area can, by giving an opinion, assist a factfinder. Corning Glass Works v. Seaboard Sur. Co.,112 R.I. 241, 247, 308 A.2d 813, 817 (1973) (citing Morgan v.Washington Trust Co., 105 R.I. 13, 249 A.2d 48 (1969)). Like all other testimony, "[t]he purpose of expert testimony is to aid in the search for the truth." Morra v. Harrop,791 A.2d 472, 477 (R.I. 2002). Accordingly, expert testimony "need not be conclusive and has no special status in the evidentiary framework of a trial." Id. In fact, the factfinder is free to accept or to reject expert testimony in whole, or in part, or to accord it the probative value it deems appropriate. Id.
However, the United States Supreme Court has held that not all expert testimony is admissible. See Daubert v. Merrell DowPharm., Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 2795 (1993). InDaubert, the Court held that under the Federal Rules of Evidence, a trial justice had to "ensure that any and all scientific testimony or evidence admitted [was] not only relevant, but [also] reliable." Id. The Court found that Rule 702 "clearly contemplate[d] some degree of regulation of the subjects and theories about which an expert [could] testify." Id. Simply put, a trial justice must ensure that "an expert's testimony [rested] on a reliable foundation and [was] relevant to the task at hand." Id. at 597, 113 S. Ct. at 2799. *Page 17 
In light of Daubert, trial justices have become "gatekeepers" and have an obligation to ensure that testifying experts are qualified and that all scientific testimony[28] is not only relevant, but also reliable.[29]Id. at 589-97, 113 S. Ct. at 2794-99; see alsoRaimbeault v. Takeuchi Mfg., Ltd.,772 A.2d 1056, 1061 (R.I. 2001). In Rhode Island, Rule 702 guides the admission of expert testimony. See
R.I.R. Evid. 702. Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."Id.
It is well settled that the determination of admissibility of an expert's testimony rests within the sound discretion of the trial justice. State v. D'Alessio, 848 A.2d 1118, 1123 (R.I. 2004);State v. Capalbo, 433 A.2d 242, 246-47 (R.I. 1981). Most critical to a trial justice's determination is the helpfulness of the actual testimony or its "substantial probative value" to the trier of fact. Montouri v. Narragansett Elec. Co.,418 A.2d 5, 10 (R.I. 1980) (stating that to be admissible, an expert's testimony must not be speculation, mere conjecture, or surmise); Daubert,509 U.S. at 592, 113 S. Ct. at 2796 (stating that when "[f]aced with a proffer of expert scientific testimony . . . the trial judge must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue"); see also
R.I.R. Evid. 702 Advisory Committee's Note (stating that "Rhode Island *Page 18 
law and practice on the use of expert testimony is consistent with FRE 702 [which] makes helpfulness to the trier of fact the crucial issue").
To determine whether an expert is qualified, a trial justice should consider "evidence of the witness's education, training, employment, or prior experiences." D'Alessio,848 A.2d at 1123 (quoting State v. Villani,491 A.2d 976, 979 (R.I. 1985)). In considering the reliability and validity of expert testimony, a trial justice should consider (1) whether the proffered knowledge can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory or technique has gained general acceptance in the relevant scientific field. DiPetrillo,729 A.2d at 689. Satisfaction of one or more of these factors may be sufficient to admit the evidence and each factor need not be given equal weight in the analysis. Owens v. Silvia,838 A.2d 881, 892 (R.I. 2003) (citing DiPetrillo,729 A.2d at 689). Moreover, "when the proffered knowledge is neither novel nor highly technical, satisfaction of one or more of these factors is not a necessary condition precedent to allowing the expert to testify." Id.
 1 Roberts' Testimony
KP moved to strike Stephen Roberts' (Roberts) testimony and analysis on the grounds that it was speculation and conjecture.See KP's Post-Trial Mem. 83.[30] It alleges that Roberts did not have a sufficient factual basis, did not employ a reliable methodology, and that his opinion is irrelevant to the issues at hand. Id. However, Plaintiffs offered Roberts' testimony to establish a necessary component of their claim — harm to the Limited Partners. See Pls.' Post-Trial *Page 19 
Reply Mem. 12-13. Plaintiff relied on Roberts to opine as to specific aspects of Quaker Towers' income statements that appeared inappropriate given industry standards and Quaker Towers' circumstances. Id. This testimony was necessary in order to provide a rational model to compare against QTA's actual financial performance, which Plaintiffs alleged was distorted by KP's disloyalty. Id. at 13-14.
Furthermore, the Court finds that Roberts' analysis was sufficiently reliable. Abby Medical/Abby Rents,Inc. v. Mignacca, 471 A.2d 189, 195 (R.I. 1984) (stating that the court's damages analysis need not be made with a mathematical certainty, but simply guided by some rational standard). Roberts testified that he often performed the type of analysis done in the instant matter, stating that he is "often asked by owners of current[ly] operating properties . . . to produce a budget to tell them how [he] thinks a property should operate." (Tr. 200.) Moreover, although Roberts performed a retrospective pro forma, the methodology used was "basically the same." Id. at 375.
KP contends that even Roberts himself could not guarantee the reliability and credibility of his analysis. See KP's Post-Trial Mem. 84; see Tr. 372-374. Despite Roberts' inability to guarantee the accuracy and reliability of his analysis, the Court finds that his testimony was not mere conjecture or surmise. Morra, 791 A.2d at 477 (citing Sweet v. HemingwayTransp., Inc., 333 A.2d 411, 415 (R.I. 1975). Although Roberts could only guarantee that "for the most part [his analysis and pro forma predictions were] pretty accurate," it does not matter what specific words he used to convey his certainty. Id.;Gallucci, 709 A.2d at 1066 (stating that the admissibility of expert testimony does not require the use of "magic words" or "precisely constructed talismanic incantations" to achieve its objective). As long as an expert has testified with "some degree of positiveness," absolute certainty is not required in order *Page 20 
for an expert's testimony to be admissible, and issues relative to the weight of the evidence are left to the factfinder.Sweet, 333 A.2d at 415.
The Court also finds that Roberts' analysis was grounded with a sufficient factual basis. As part of his analysis, Roberts (1) evaluated historical financial information (including audited financial statements) from both Quaker Towers and other comparable properties managed by his company; (2) inspected the Property; (3) reviewed deposition testimony of KP's witnesses; and (4) consulted operating statements for other properties within the Package. See Tr. 363-65, 384, 388-392, 413-415. Consequently, Roberts was able to identify, with a reasonable degree of professional certainty, specific categories of expenses or income that he believed — based on his experience and review of industry standards — were unreasonably high or low for an apartment project like Quaker Towers. See e.g., Tr. 450-55, 465-68, 471-74. Therefore, based on Roberts' analysis and testimony, the Court is satisfied that Plaintiffs provided a rational model by which to quantify their harm. See Long v. Atlantic PBS, Inc.,681 A.2d 249, 252 (R.I. 1996)
Where, as here, the evidence and testimony proffered by Roberts was not particularly "novel" or "highly technical," Roberts' analysis was grounded with a sufficient factual basis, could be tested, and was sufficiently accurate, the Court finds the testimony to be reliable, credible, and admissible. As a result, the Court denies KP's motion to strike Roberts' testimony.
 2 Andolfo, Doyle Ryan's Testimony
KP similarly moved to strike Thomas Andolfo (Andolfo), Alan Doyle (Doyle), and Daniel Ryan's (Ryan) testimony on the grounds that they acted as advocates on behalf of the *Page 21 
Limited Partners, were not sufficiently independent, and cannot assist the trier of fact.[31] See KP's Post-Trial Mem. 84. Conversely, Plaintiffs contend that KP has misconstrued the purposes for which they offered the testimony of these experts.See Pls.' Post-Trial Reply Mem. 14. Plaintiffs claim that their experts were not acting as advocates for the Limited Partners, but merely providing non-biased testimony — utilizing necessary assumptions — to show how distributions to the Limited Partners would have been different had KP's management not been marred by the alleged breaches.Id.
Although the Court acknowledges that expert testimony may be stricken if the methods or testimony opined by an expert constitute advocacy, those facts are simply not before this Court.See e.g., Estate of Halas v. Commissioner,94 T.C. 570, 578 (T.C. 1990); Trigon Ins. Co. v. UnitedStates, 204 F.R.D. 277, 295 (E.D. Va. 2001); Salas v.Carpenter, 980 F.2d 299, 305 (5th Cir. 1992). Plaintiffs offered Andolfo's testimony in order to provide the trier of fact with a comparison of what Quaker Towers' value would have been had KP not allegedly violated its fiduciary duties. Although Andolfo relied on Roberts' financial statements — reflecting what he determined to be reasonable income and expenses — and the assumption that the Property had been suitably maintained in "average" condition, these assumptions were necessary in order to create a proper comparison. Moreover, Andolfo's reliance on Roberts' analysis was further supplemented by his own experience and industry figures, confirming Roberts' numbers were reasonable. See
Tr. 310, 325, 327-28, 340. *Page 22 
Furthermore, KP's claim that Andolfo's testimony should be stricken based on his adjustments to his final opinion is simply unavailing. Despite KP's numerous citations to ethics rules, Andolfo's testimony was not a biased analysis, opinion, or conclusion. Andolfo merely testified that based on recent revisions, and the new information that had been proffered, he would have amended his final opinion. Id. at 292-95.
Despite KP's attempts to depict Ryan as an alter-ego for Plaintiffs, the Court finds that Ryan's testimony was based upon his independent reading of the LP Agreement — in light of usual accounting practices and principles — as well as a subsequent application of the LP Agreement's language to QTA's audited financial statements. See e.g., Tr. 752-56, 763, 793-96. Regardless of Ryan's numerous misstatements that he was an "advocate," the Court is satisfied that throughout Ryan's testimony he provided a sufficient explanation of his analysis and established that his conclusions were made as a result of his own independent opinion and analysis.[32] Id.
Similarly, the Court finds that Doyle's testimony was credible, reliable, and independent. Plaintiffs offered Doyle's testimony to show that QTA could have refinanced earlier had KP's alleged breaches not occurred. As part of his analysis, Doyle reviewed QTA's audited financial statements, Roberts' financial adjustments, an appraisal, and historic interest rates to determine if and when QTA could have refinanced its debts. See Tr. 642-46. As a result, Doyle was able to form an opinion, with a reasonable degree of professional certainty, as to when Quaker Towers could have refinanced and what the resulting savings would have been.Id. at 658-660. Therefore, despite KP's contentions, the Court is satisfied that through Doyle's analysis and *Page 23 
testimony, Plaintiffs provided a rational model by which to quantify the damages that Plaintiffs allege resulted from breaches by KP.
Accordingly, the Court denies KP's motion to strike Andolfo, Doyle, and Ryan's testimony. The Court finds that each expert's reliance on certain assumptions was necessary in order for Plaintiffs to establish a comparison by which to judge their alleged harm. Moreover, each expert relied on their experience and industry standards in conducting their independent analysis and review. Therefore, the Court finds that Andolfo, Doyle and Ryan were not improperly advocating, that their testimony was neither particularly novel nor highly technical, and that they provided reliable and credible evidence necessary to assist the trier of fact.[33]
 B Breach of Fiduciary Duty[34]
To prevail on a claim for breach of fiduciary duty, a plaintiff must establish "(1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the *Page 24 
breach."[35] Griffin v. Fowler,260 Ga. App. 443, 445, 579 S.E.2d 848, 850 (Ga. Ct. App. 2003);Lyons v. Midwest Glazing,265 F. Supp. 2d 1061, 1076 (N.D. Iowa 2003); 37 Am. Jur. 2d Fraud and Deceit § 31 (2010) (stating that the elements of a breach of fiduciary duty claim are "(1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary").
By establishing the existence and breach of a fiduciary duty, a party overcomes the presumptions of the business judgment rule, shifting the burden of proof to the fiduciary. Tomaino v. ConcordOil of Newport, Inc., 709 A.2d 1016, 1021 (R.I. 1998). The burden of proof requires the general partner to prove the "entire fairness" of the challenged transaction. Cede Co. v. Technicolor,Inc., 634 A.2d 345, 361 (Del. 1993). "Under the entire fairness standard of judicial review, the defendant [general partner] must establish to the court's satisfaction that the transaction was the product of both fair dealing and fair price." Id.;Tomaino, 709 A.2d at 1021 (stating that to satisfy its burden, a fiduciary must show that the challenged transaction was both fair and authorized, approved, or ratified); Konover Dev. Corp. v.Zeller, *Page 25 228 Conn. 206, 229-30, 635 A.2d 798, 810 (1994) (stating that the burden of proof shifts to the fiduciary to show by clear and convincing evidence that it complied with its fiduciary obligations). In essence, the general partner must establish that the transaction had all the earmarks of an arms-length bargain or that a full disclosure of all the material facts in connection with the challenged transaction was made. Tomaino,709 A.2d at 1022 (citing Winchell v. Plywood Corp.,324 Mass. 171, 177, 85 N.E.2d 313, 317 (1949)); Konover,228 Conn. at 229-30, 635 A.2d at 810; see also 59A Am. Jur. 2d Partnership § 285 (2003); G.L. 1956 § 7-12-31.
If a fiduciary fails to establish fair dealing, the court may award damages to remedy the plaintiff's proven harm. SeeStandard Mach. Co. v. Duncan Shaw Corp.,208 F.2d 61, 65 (1st Cir. 1955) (stating that where a plaintiff has established a breach of fiduciary duty and some resulting harm, the court may award damages to compensate the injured party for its losses); Lux v. Envtl. Warranty, Inc.,59 Conn. App. 26, 42, 755 A.2d 936, 945 (2000) (stating that a showing of harm is required because if there are no discernable damages resulting from the breach, there is no amount of profit for the defendant to apportion in direct or indirect relationship to the breach).
Courts, however, will not award damages grounded in speculation or uncertainty. UST Corp v. General Rd. Trucking Corp.,783 A.2d 931, 942-43 (R.I. 2001); Cincinnati Bell CellularSys. Co. v. Ameritech Mobile Phone, No. 13389, 1996 WL 506906, at *20 (Del. Ch. Sept. 3, 1996). An award must be based on a reasonable estimate, have been established with a "reasonable certainty," or flow from a "rational model."Long, 681 A.2d at 252; Mignacca,471 A.2d at 195 (stating that the court's damages analysis need not be made with a mathematical certainty, but simply guided by some rational standard). *Page 26 
 1 The General Partner's Fiduciary Duty
It is well settled that partners owe a fiduciary duty to each other and the partnership under the common law. See Sullivan v.Hoey, 102 R.I. 487, 488, 231 A.2d 789, 790 (1967);Lockwood v. Edwards,46 R.I. 267, 270, 126 A. 757, 758 (R.I. 1924) (stating that the relation between partners is fiduciary in nature); Meinhard v.Salmon, 249 N.Y. 458, 164 N.E. 545 (1928); 59A Am. Jur. 2d Partnership § 853 (2003). Additionally, when the provisions of the UPA and the ULPA are read together, it is clear that a general partner in a limited partnership owes a fiduciary duty to the limited partners under those statutes as well. The ULPA provides that "a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to the partnership and to the other partners." Sec. 7-13-24. Under the UPA, a partner in a general partnership is accountable to the other partners and the partnership as a fiduciary.See § 7-12-32. The UPA provides that
 "every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him or her without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him or her of its property." Id.
Therefore, in a limited partnership, a general partner's duty to exercise the utmost good faith, due care, and loyalty is required both by statute and common law.[36] See Boxer v. Husky OilCo., 429 A.2d 995, 997 (Del. Ch. 1981) *Page 27 
 2 The Duty of Undivided Loyalty
A corporate general partner and the directors of that general partner owe a fiduciary duty of loyalty to a limited partnership and its limited partners. Zoren, 836 A.2d at 528 (citingBoston Celtics, 1999 WL 641902, at *4). A general partner is held to a standard of undivided loyalty that is "relentless and supreme." Meinhard, 249 N.Y. at 467-68, 164 N.E. at 548;Birnbaum v. Birnbaum,73 N.Y.2d 461, 466, 539 N.E.2d 574, 576 (1989) (stating that "it is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect");Pouzzner, 67 F. Supp. at 883 (stating that a fiduciary's duty of undivided loyalty "applies alike to agents, partners, guardians, executors and administrators, directors and managing officers of corporations, as well as to technical trustees"). *Page 28 
The duty of loyalty required KP to act fairly and in good faith towards the Partnership and the Limited Partners and place those interests above its own. Tomaino, 709 A.2d at 1021 (stating that fairness requires that no transaction or contract entered into by a fiduciary confer undue or unjust advantage on the fiduciary);Ed Peters Jewelry Co. v. C J Jewelry Co.,51 F. Supp.2d 81, 99 (D.R.I. 1999) (noting that the Rhode Island Supreme Court has held that a fiduciary duty imposes upon fiduciaries an obligation to act in the utmost good faith and to place the interests of the party owed a duty before their own);Demoulas v. Demoulas Super Mkts., Inc.,424 Mass. 501, 528, 677 N.E.2d 159, 179-80 (Mass. 1997) (stating that fiduciaries must "act with absolute fidelity" and "must place their duties to the [enterprise] above every other financial or business obligation).
The duty of loyalty is transgressed when a fiduciary uses his or her office or control over the enterprise, "to promote, advance or effectuate a transaction between the corporation and such person (or an entity in which the fiduciary has a substantial economic interest, directly or indirectly) and that transaction is not fair to the corporation." Solash v. Telex Corp., Nos. 9518, 9525, 9528, 1988 WL 3587, *7-8 (Del. Ch. Jan. 19, 1988);Tomaino, 709 A.2d at 1021 (stating that self-dealing occurs when a fiduciary enters into a transaction with an entity that he or she also serves as a fiduciary). Simply put, the duty of loyalty requires that a fiduciary act in the best interest of the partnership and its members whose interests take precedence over any interest possessed by the fiduciary. See Cede Co.,634 A.2d at 361.
In addition to avoiding blatant self-dealing, this "`inflexible' rule of fidelity," also requires "avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty."Birnbaum, 73 N.Y.2d at 466, 539 N.E.2d at 576 (quoting Inre Ryan's Will, 52 N.E.2d 909, 924 (N.Y. 1943)). Included within the scope of this *Page 29 
inflexible rule, "is every situation in which a fiduciary, who is bound to single mindedly pursue the interests of those to whom a duty of loyalty is owed, deals with a person `in such close relation [to the fiduciary] . . . that possible advantage to such other person might . . . consciously or unconsciously' influence the fiduciary's judgment." Id. (quoting Albright v.Jefferson Cnty. Nat'l Bank, 53 N.E.2d 753, 756-57 (N.Y. 1944));Pouzzner, 67 F. Supp. at 882-83 (stating that a partner or trustee simply may not "place himself in any other position which would subject him to conflicting duties or expose him to temptation of acting contrary to the best interests of his original cestui que trust" due to the risk that the fiduciary could successfully conceal any fraud); Point Trap Co. v. Manchester,98 R.I. 49, 54, 199 A.2d 592, 596 (1964). Simply put, the Court must determine whether the fiduciary "has placed itself in a position `where its interest was or might be in conflict with its duty.'"Albright, 53 N.E.2d at 756 (quoting Ryan's Will,52 N.E.2d at 923).
 a Breach of the Duty of Undivided Loyalty
Here, the corporate relationship between PIC and KP, as well as the structure of the Partnership and management of the Package, is infected with self-interest and conflicted interest. As a wholly-owned subsidiary of PIC, KP did not file a separate tax return. See Tr. 849. Instead, each year PIC filed a consolidated tax return that treated KP's gains and losses as belonging to PIC. Id. As a result, PIC and its officers had a direct interest in KP's management of both the Package and the Partnership given its effect on PIC's yearly gains and losses.
Moreover, KP managed Quaker Towers as part of the Package. Certain properties within the Package were owned as limited partnerships — with outside investors as limited *Page 30 
partners and KP (or related entities) as general partner — and others were wholly-owned by PIC or a PIC affiliate.[37] As a result, KP was in a position in which it could divert costs and expenses away from properties in which KP or PIC maintained the sole interest, and allocate them to properties such as Quaker Towers where those expenditures would be shared by the Limited Partners. Essentially, by allocating these costs and expenses, KP could depress QTA's profits, reducing the amount to share with the Limited Partners, while at the same time reducing the liabilities of properties owned entirely by PIC.
Furthermore, numerous PIC officers and executives held positions in KP and other affiliated companies that transacted business with KP and the Partnership.[38] Specifically, the very nature of Uritescu's positions at PIC and KP, and his financial interests in companies which transacted business with QTA, created situations in which these personal and professional interests conflicted with his fiduciary duties to QTA.[39] In fact, Uritescu (1) served simultaneously as the Executive Vice President and Treasurer of both KP and PIC; (2) held positions or possessed interests in companies which owned or managed apartment projects within the Package; (3) maintained a financial interest in companies which transacted business *Page 31 
with QTA, such as Starlight and WebeConsulting;[40] (4) was married to the daughter of Ronald R.S. Picerne, a beneficiary of the Picerne Family Trust which had contracted with QTA to provide coin-operated laundry services to the Property; and (5) stood on both sides of the note modification agreements executed in connection with PIC's purchase of the Recoll Note, signing on behalf of PIC and QTA/KP.
As a result, given the corporate relatedness between PIC and KP, as well as the managerial structure of the Package, KP and its overlapping corporate officers were often placed in positions where their duty of undivided loyalty to the Partnership conflicted with other financial and corporate interests. See Bardis,199 Cal. App. 4th at 15-16, 14 Cal. Rptr. 3d at 100 (stating that when "one undertakes to deal with himself in different capacities . . . there is a manifest hostility in the position he occupies[; he is called upon] to act for the best interests of his principal [while] his self interest prompts him to make the best bargain for himself"). Therefore, in light of KP's corporate alignment with PIC, the overlap of corporate officers, and the structure of KP's management of the Package, KP and its officers were placed in a conflict of interest in breach of the duty of undivided loyalty.[41] See Birnbaum,73 N.Y.2d at 466, 539 N.E.2d at 576; *Page 32 Pouzzner, 67 F. Supp. at 882-83; Albright,53 N.E.2d at 756; George G. Bogert et al., The Law of Trusts andTrustees § 543, at 219 (2008) (stating that the rule against self-dealing extends to transactions with a firm of which the trustee is a member, a corporation in which he has a controlling or substantial interest, and with a spouse, agents, employees, and other persons whose interests are closely identified with those of the trustee).
 b Specific Breaches i Purchase of the Recoll Note
Plaintiffs claim that the General Partner failed to fully disclose the material facts of Recoll's sale of the Recoll Note — preventing QTA and the Limited Partners from having a chance to compete for the potential discount. (Pls.' Post-Trial Mem. 40-41.) Further, Plaintiffs argue that KP and PIC's overlapping officers and agents worked to secure the benefit of the sale for PIC and then continued to charge QTA on a mortgage they knew QTA could not service. Id. Conversely, KP asserts that because the mortgage was purchased by PIC — a separate and distinct corporate entity — it should not be held liable for PIC's purchase of the Recoll Note. (KP's Post-Trial Mem. 59.) KP contends that the only way it could be held liable for PIC's purchase of the Recoll Note is if the Court pierces the corporate veil, through application of the alter ego doctrine, and imputes PIC's actions to KP. Id. *Page 33 
KP simply misses the point. The Court recognizes that KP cannot be held liable for PIC's actions absent fraud, bad-faith or something more than the mere existence of a parent-subsidiary relationship between two corporations. See UST Corp. v GeneralRd. Trucking Corp., 783 A.2d 931, 940 (R.I. 2001) (citingMiller v. Dixon Indus. Corp., 513 A.2d 597, 604 (R.I. 1986);National Hotel Assocs. v. O. Ahlborg Sons, Inc.,827 A.2d 646, 652 (R.I. 2003). However, the Court finds that KP is liable for its own separate breaches of the duty of loyalty by failing to fully and timely disclose the purchase of the Recoll Note to the Limited Partners and preventing them from competing for the potential discount.
The scope of KP's fiduciary duty to QTA and the Limited Partners reached all matters reasonably related to the business of the Partnership. Bakalis v. Bressler,1 Ill. 2d 72, 79, 115 N.E.2d 323, 327 (1953) (stating that the fiduciary relationship "embraces all matters reasonably relating to the partnership business"). Here, the opportunity to purchase the Recoll Note at a discount and lessen QTA's debt was unquestionably related to the business of the Partnership and within the scope of KP's fiduciary duties to QTA and the Limited Partners.
When K P learned of Recoll's desire to sell its portfolio at a discount, the duty of loyalty required that KP and its officers such as Uritescu, act for QTA's benefit and at minimum disclose the opportunity to the Limited Partners.[42] In re CumberlandFarms, Inc., 284 F.3d 216, 227-28 (1st Cir. 2002) (citingDemoulas, 424 Mass. at 529, 677 N.E.2d at 180) (stating that when a fiduciary learns of an opportunity that could benefit the enterprise to whom a duty is owed, he *Page 34 
or she must disclose the opportunity to the disinterested members of the enterprise so that they may decide whether the corporation can and should take advantage of it). "It is inherently unfair for the [officer or director] to deny the corporation that choice," and it is this non-disclosure that is itself a breach of fiduciary duty.[43] Id.; see also Wartski,926 F.2d at 14 (stating that "[a] partner has a fiduciary obligation to the partnership of the utmost good faith and loyalty and *Page 35 
cannot divert a business opportunity for his own gain without first making a complete and unambiguous disclosure to the partnership").
Instead, given the corporate relatedness of KP and PIC, KP and its officers found themselves in a position where they owed conflicting duties to PIC and KP. The overlapping officers of KP and PIC chose to secure the benefit of the discount for PIC, failing to fully or timely disclose the opportunity to the Limited Partners, and breaching their fiduciary duties. Furthermore, despite knowing that QTA could not continue to service the $1,070,000 debt, Uritescu executed the Note Modification Agreement — acting on both sides of the transaction by signing on behalf of PIC and QTA/KP — obligating QTA to continue servicing the full amount of the mortgage after it had been assigned to PIC at a substantial discount. See Pls.' Exs. 24 25; Tr. 125, 998.
Although KP claims that PIC's acquisition of the Recoll Note benefited the Partnership and was entirely fair, this Court does not agree. (KP's Post-Trial Mem. 61.) The fiduciary duty among partners requires that each partner make full disclosure at the appropriate time of all material facts within his or her knowledge in any way relating to the partnership affairs. See Union Pac. Res. Group,Inc. v. Rhone-Poulenc, Inc., 247 F.3d 574, 586 (5th Cir. 2001);Dynan v. Fritz,400 Mass. 230, 242, 508 N.E.2d 1371, 1378 (1987) (stating that "good faith requires full and honest disclosure of all relevant circumstances to permit a disinterested decisionmaker to exercise its informed judgment"). In fact, a fiduciary plainly violates his duty of loyalty if his disclosure of the corporate opportunity is "misleading, inaccurate, and materially incomplete."Demoulas, 424 Mass. at 538, 677 N.E.2d at 185; see alsoMeinhard, 249 N.Y. at 465, 164 N.E. at 547 (emphasizing that the secrecy surrounding the real estate acquisition was the basis for concluding that a partner breached his fiduciary duty to his co-partner). *Page 36 
Here, the relevant audited financial statement merely indicated that "an affiliate of the general partner [was] currently negotiating the purchase of the second mortgage note from the lender." See Pls.' Ex. 6. Subsequent to PIC's purchase of the Recoll Note, the audited financial statements merely noted that "[a]n affiliate of the general partner purchased the second mortgage note from the lender in September 1995."Id. At no point did the General Partner fully disclose (1) the terms of the transaction before pursuing the opportunity; (2) that PIC was the affiliate that had purchased the Recoll Note; or (3) that it had been purchased at a significant discount. Id. Likewise, Uritescu failed to disclose the terms of the Note Modification Agreement to the Limited Partners before executing the agreement for PIC and the Partnership. See Pls.' Ex. 24 25; Tr. 125.
Moreover, the fact that PIC and not KP profited from the purchase does not alter the Court's analysis. KP and PIC shared officers, and as a result KP was placed in a position in which its own relationship with PIC could have and did prevent it from acting in the Partnership's best interest. See Cumberland,284 F.3d at 229 (citing Geller v. Allied-Lyon PLC,42 Mass. App. Ct. 120, 123, 674 N.E.2d 1334, 1337 (Mass. App. Ct. 1997). Here, KP and the overlapping officers such as Uritescu, neglected their duty to QTA by allowing PIC to reap the benefit of the Recoll Note and obligating QTA to continue servicing a loan it knew QTA could not afford.[44] *Page 37 
As a result, this Court finds that KP breached its fiduciary duty of loyalty by favoring PIC over the Limited Partners, failing to fully disclose the Recoll sale, and preventing QTA and the Limited Partners from competing for the opportunity.[45] Because KP has failed to establish the fairness of the transaction, the Court finds that the Plaintiffs are entitled to the difference between the price paid by PIC for the Recoll Note and the amount paid by QTA to extinguish it.
 ii Laundry Income
Plaintiffs further contend that KP breached its duty of loyalty by contracting with the Picerne Family Trust to provide coin-operated laundry services to Quaker Towers. (Pls.' Post-Trial Mem. 64). Plaintiffs assert that by contracting with the Picerne Family Trust, KP, and specifically Uritescu, engaged in self-dealing and failed to act in the QTA's best interest. Id.
Self-dealing occurs when a fiduciary enters into a transaction with an entity that he or she also serves as a fiduciary. SeeTomaino, 709 A.2d at 1021 (stating that although self-interested transactions are not voidable per se, they are vigorously scrutinized by the courts). Here, KP and Uritescu entered into a transaction with the Picerne Family Trust — an entity in which Uritescu's wife was a beneficiary — without engaging in an arm's length transaction or disclosing the self-interested transaction in the audited financial statements. Id. In fact, during the years that the Property was owned by QTA, the laundry services contract was never put out to bid. *Page 38 
(Tr. 68.) Instead, the Picerne Family Trust maintained the contract for the duration of QTA's ownership and split the gross proceeds 50/50. Id. at 530.
Despite KP's failure to put the laundry services contract out to bid or to disclose the self-interested nature of the transaction, the Court finds that KP has sufficiently established the fair price and fair dealing of the transaction. Cede Co.,634 A.2d at 361; Tomaino, 709 A.2d at 1021. In fact, experts for both KP and the Limited Partners testified that a 50/50 split of the proceeds was typical and reasonable. (Tr. 530-31, 1322-23.) Moreover, the Court finds that the Partnership's laundry income and gross collections were consistent with the income and gross collections following the sale of Quaker Towers in 2004 and the assumption of laundry services by Mac-Gray, particularly in light of the margin of error for laundry income from year-to-year.[46]Id. at 528-530; Def.'s Ex. BB.
As a result, the Court finds that Defendant has satisfied its burden of establishing the entire fairness of the laundry contract with the Picerne Family Trust. Although KP failed to put the contract out to bid or disclose the interested nature of the transaction, KP has satisfied this Court that the contract was fair and reasonable. Furthermore, in light of the consistency between the income collected before and after QTA's sale of Quaker Towers, the Court finds that Plaintiffs have failed to establish any harm that resulted from QTA's contract with the Picerne Family Trust. *Page 39 
 iii 2002 Refinancing
The Limited Partners allege that KP breached its fiduciary duty of loyalty by failing to refinance QTA's indebtedness on the Recoll Note until December 2002. (Pls.' Post-Trial Mem. 38.) In contrast, KP argues that the LP Agreement granted KP the authority to make all decisions with respect to mortgages and refinancing and did not require it to seek the approval of the Limited Partners. (KP's Post-Trial Mem. 63.)
Despite the nature of KP's conflicted interest and the loss of savings that may have resulted had KP been able to refinance QTA's indebtedness sooner, the Court finds that KP's actions were entirely fair. Unlike PIC's purchase of the Recoll Note and Uritescu's subsequent self-interested execution of the Note Modification Agreement, the terms of the LP Agreement explicitly granted the General Partner sole authority to make all decisions relating to QTA's refinancing of its debt. See Pls.' Ex. 1 ¶ 14.2. In fact, Plaintiffs' own expert, Alan Doyle, testified that there is no "rule of thumb as to when a property owner should refinance." (Tr. 697.) Doyle testified that it's a "very specific" and "very subjective decision" often "tailor made" to the owner and requiring an examination by the owner of existing indebtedness, duration of future ownership, interest rates, cash flow concerns, and investment objectives. Id. at 697-98. From the lender's perspective, when considering a financing application they consider "[t]he interest rate climate at that point in time, availability for financing, the ability of the property to sustain the requested debt," the terms of existing financing on the property, and prepayment penalties. Id. at 1064-65. Additionally, lenders will consider the operating history of the property, the environment and market in which the property sits, and the financial circumstances of the borrower. Id. *Page 40 
Here, QTA's financial statements contained a "Going Concern" note that related to its inability to pay its debts as they came due.Id. at 1071-72. This note was not removed until the 1999 audited financial statement was issued on February 9, 2000.Id. at 1045; Pls.' Ex. 6. Despite the "clean" audited statement, it is unlikely that KP could have refinanced the mortgage on the Property until sometime in March 2001, as lenders typically would look for several years of solid operating history before underwriting a loan. Id. at 1055. Therefore, given the subjective nature of the decision to refinance, the explicit discretion granted to the General Partner with respect to refinancing, and the financial condition of the Property, the Court finds that the General Partner did not breach its fiduciary duty of loyalty by failing to refinance until December 2002.
 iv Operating Expenses
Plaintiffs contest the Property's expenses for: (1) payroll; (2) employee apartments; (3) computer fees/repairs; (4) transportation costs; (5) audit fees; and (6) the truck. (Pls.' Post-Trial Reply Mem. 4-6.) KP contends that the General Partner acted appropriately in light of the depressed economic times and ensured that the Property operated within its revenue constraints, met its debt obligations, and avoided foreclosure. (KP's Post-Trial Mem. 66.)
Despite the General Partner's conflicted position and the benefit that would ensue from over-allocating expenses to Quaker Towers, the Court finds that KP has established that QTA's operating expenses were entirely fair and sufficiently disclosed.[47] In making payroll and employee apartment allocations, KP ensured that "on a per unit basis . . . allocations [were] fair *Page 41 
and equitable." (Tr. 1283-84.) In fact, a comparison of total payroll allocations (including payroll, taxes, benefits, and employee apartments) made across the Package for the period of 1998 through 2004 indicated that although Quaker Towers represented approximately one-third of the units in the Package, its payroll expense allocations ranged between 28% and 32% of the total expenses.[48] See Def.'s Ex. L.
Similarly, the Court finds that Quaker Towers' expenses related to computer fees, transportation expenses, and audit fees were entirely fair and reasonable. In light of Quaker Towers' size and the resources required to operate and manage the complex, KP has sufficiently established the legitimacy of its computer and technology-related expenses.[49] Employee reimbursement for gas and travel is a legitimate management expense. (Tr. 588.) Although the allocation system "was not perfect," the Court believes it was a fair and equitable way to allocate the expense.Id. at 1212-13. Likewise, although the LP Agreement required only certified financial statements and not audited financial statements — and did not specify that Ernst Young had to be retained — the additional expense was not an unreasonable business practice. Id. at 135-36. In fact, the LP Agreement specifically authorized the General Partner to "employ, *Page 42 
on behalf of the [P]artnership, such persons, firms or corporations as it in its sole judgment, shall deem advisable in the operation and management of the business of the [P]artnership. . . ."See Pls.' Ex. 1 ¶ 15.3.
Furthermore, despite Plaintiffs' contentions, the expenses incurred by Quaker Towers in connection with its purchase of a pick-up truck in 2001 were fair and reasonable. Quaker Towers not only generally benefitted from its ownership, but the truck was necessary for rubbish removal, snow plowing, landscaping, and transporting goods. (Tr. 556-57, 1213, 1329-30.) Additionally, the truck was purchased from an unrelated entity, was depreciated as a tax benefit to the Partnership and Limited Partners, and was used at the Property 95% of time.[50]Id. at 549-56, 1245-46.
As a result, the Court finds that the Limited Partners have sufficiently established the reasonableness and fairness of Quaker Towers' operating expenses. In light of its determinations, the Court finds that the Limited Partners have not suffered any harm in connection with operating expenses related to (1) payroll; (2) employee apartments; (3) computer fees/repairs; (4) transportation costs; (5) audit fees; or (6) Quaker Towers' purchase of the truck.
 3 Duty of Due Care
The duty of care requires a fiduciary to act on an informed basis.Cede Co., 634 A.2d at 376. It "requires that a [fiduciary] use that amount of care which ordinarily careful and prudent men would use in similar circumstances and consider all material information reasonably available in making business decisions."In re Walt Disney Co. Derivative Litig.,907 A.2d 693, 749 (Del. Ch. 2005), *Page 43 aff'd, 906 A.2d 27 (Del. 2006); Brehm v. Eisner,746 A.2d 244, 259 (Del. 2000) (stating that "in making business decisions, [a fiduciary] must consider all material information reasonably available").
It is well settled that a fiduciary owes a duty of the utmost care.[51] Tomaino, 709 A.2d at 1021; Boxer,429 A.2d at 997. In determining whether the duty of due care has been fulfilled, a court should examine whether a fiduciary's actions were "want of reasonable care" after considering the nature of the business, the fiduciary's particular duties, and the circumstances in which he was expected to perform them. See Conaty v.Torghen, 46 R.I. 447, 453, 128 A. 338, 341 (R.I. 1925); seealso Citron v. Fairchild Camera Instrument Corp.,569 A.2d 53, 66 (Del. 1989) (stating that in determining whether the duty of due care was fulfilled, a court should look for evidence of whether the fiduciary has acted in a deliberate and knowledgeable way).
 a Breach of Duty of Due Care
The Limited Partners argue that KP breached its duty of care by failing to adequately maintain Quaker Towers during the period of QTA's ownership. (Pls.' Post-Trial Mem. 47.) They contend that the condition of Quaker Towers at the time of its sale in 2004, in addition to KP's failure to adopt water conservation measures such as low-flow toilets, clearly demonstrate a pattern of chronic underinvestment in capital maintenance and improvement in violation of KP's obligation to maintain the value of the Partnership's investment.[52] Id. at 49. *Page 44 
Where, as here, Quaker Towers was in a distressed economic situation, the Property was operated within revenue constraints, had limited cash flow, faced large debt service obligations, and avoided foreclosure, the Court finds that KP appropriately managed Quaker Towers. (Tr. 1337.) Despite KP's conflicted position, KP's management and maintenance of the Property was reasonable under the circumstances. Although KP failed to undertake a study of the financial benefits of low-flow toilets, KP did not believe it was "an economically good decision to make at the time."Id. at 169. Given QTA's financial condition, the Partnership lacked the funds to replace existing toilets and had to prioritize the needs of the Property. Id. at 1247, 1331.
As a result, the Court finds that KP did not breach its duty of due care to QTA and the Limited Partners. Although the Property required capital maintenance and improvements at the time of sale in 2004, [53] Plaintiffs have failed to sufficiently establish that KP mismanaged the Property or failed to act reasonably and with the degree of care required in light of Quaker Towers' financial condition.
 C Breach of Contract 1 Partnership Distributions
Separate from its fiduciary obligations, Plaintiffs contend that KP's failure to make annual distributions of "available net income" to the Limited Partners was a breach of the LP *Page 45 
Agreement. (Pls.' Post-Trial Mem. 49-50.) They assert that the Limited Partners were entitled to distributions during the period of 1994 through 2004 as provided by the clear and unambiguous language of the LP Agreement. Id. Conversely, Defendant argues that it was not required to make distributions during the period of 1994 through 2004 based on its calculation of "available net income." (KP's Reply Mem. 13-14.) Additionally, Defendant asserts that even if it was required to distribute "available net income" there was no cash available with which to make these distributions. (KP's Post-Trial Mem. 77.)
Under the ULPA, "[d]istributions of cash or other assets of a limited partnership shall be allocated among the partners, and among classes of partners, in the manner provided in the partnership agreement."[54] Sec. 7-13-30. Additionally, the ULPA provides:
 "[A] partner is entitled to receive distributions from a limited partnership before his or her withdrawal from the limited partnership and before the dissolution and winding up of the limited partnership to the extent and at the times or upon the happening of the events specified in the partnership agreement." Sec. 7-13-31. *Page 46 
Here, the LP Agreement provided that the Partnership's "available net income" "shall be distributed" not less often than annually as follows: (1) "all of the available net income for each year up to $18,000 shall be distributed on a non-cumulative basis to the Limited Partners . . ."; (2) "[a]ll of the available net income for each year in excess of $18,000 and up to $36,000 shall be distributed on a non-cumulative basis to the General Partner"; and (3) "[a]vailable net income for each year in excess $36,000 shall be distributed to the partners (Limited and General), without priority. . . ." See Pls.' Ex. 1 ¶¶ 9-9.2.
While the method by which distributions of "available net income" are made is undisputed, the parties do contest the method of calculating "available net income" under the terms of the LP Agreement. Despite the parties' dispute, if the LP Agreement's terms are clear and unambiguous, judicial construction is at an end and the terms will be applied as written. W.P. Assocs. v. Forcier,Inc., 637 A.2d 353, 356 (R.I. 1994). The determination of ambiguity is a question of law and is confined to the four corners of the agreement. Rubery v. Downing Corp.,760 A.2d 945, 947 (R.I. 2000). "In determining whether a contract is clear and unambiguous, the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning."Paradis v. Greater Providence Deposit Corp.,651 A.2d 738, 741 (R.I. 1994); Aetna Cas. Sur. Co. v.Sullivan, 633 A.2d 684, 686 (R.I. 1993) (stating that when determining whether or not a particular contract is ambiguous, a court should refrain from engaging in mental gymnastics or from stretching the imagination to read ambiguity where none is present). Courts have consistently held that a contract is ambiguous only when it is "reasonably and clearly susceptible to more than one interpretation." Rubery, 760 A.2d at 947; Rotelli v.Catanzaro, 686 A.2d 91, 94 (R.I. 1996). *Page 47 
Here, by stating that "available net income . . . shall be distributed[,]" the parties agreed to mandatory distributions that would occur at a minimum on a yearly basis. Unlike the use of the word "may," which implies an allowance of discretion, "shall" imposes a mandatory requirement on the parties. See Castelli v.Carcieri, 961 A.2d 277, 284 (R.I. 2008) (quoting Conrad v.State of R.I. Med. Ctr. Gen. Hosp.,592 A.2d 858, 860 (R.I. 1991)) (stating that the "use of the word `shall' contemplates something mandatory or the `imposition of a duty'"); Brown v. Amaral, 460 A.2d 7, 10 (R.I. 1983) (quotingCarpenter v. Smith,79 R.I. 326, 334-35, 89 A.2d 168, 172-73 (1952)) (noting that the "word `shall' usually connotes the imperative and contemplates the imposition of a duty" unless the particular context requires a contrary meaning).
Furthermore, the LP Agreement defines "available net income" as "the excess, if any, of (a) the net income of the [P]artnership for such year, over (b) all amounts paid or accrued in such year
on account of the principal on mortgages and other indebtedness of the [P]artnership."Id. ¶ 9 (emphasis added). Under the plain terms of the LP Agreement, the calculation of "available net income" is a function of the Partnership's "net income"[55] and the amount the Partnership has paid or incurred during the year to reduce the principal balance on its debts. Therefore, the Court finds that Defendant unreasonably opined that under the terms of section 9, "paid or accrued in *Page 48 
such year" applied only to principal on mortgages and not to other indebtedness. See Tr. 1183-84. Additionally, despite Defendant's best efforts, "other indebtedness" cannot be parsed out or divorced from the preceding words of section 9 and does not give rise to a third component of the "available net income" calculation.[56] Id. at 1189, 1193-94.
Similarly, the LP Agreement does not condition distributions of "available net income" on the amount of cash or cash equivalents available to the Partnership at each year end. In light of the mandatory nature of the Partnership distributions, the General Partner had a contractual obligation to make annual distributions in accordance with the LP Agreement whenever there was an excess of "available net income." Regardless of what Defendant may assert as "common sense business practice," under the plain language of the LP Agreement, distributions of "available net income," were subject only to the prior repayment of "Class A" loans. See AetnaCas. Sur. Co. v. Graziano, 587 A.2d 916, 917 (R.I. 1991) (quoting Malo v. Aetna Cas. Sur. Co.,459 A.2d 954, 956 (R.I. 1983) (stating that when an agreement's terms are clear and unambiguous, its terms must be applied as written and the parties are bound by them)). *Page 49 
As a result, the Court grants Plaintiffs' request for a full accounting of amounts due to Plaintiffs in connection with their portion of the Partnership distributions (including the sale, transfer, or liquidation of QTA's pick-up truck following the 2004 sale of Quaker Towers). Defendant shall pay to Plaintiffs the interest on the Limited Partners' portion of the distributions improperly withheld, measured from the time that distribution, if any, should have been made.
 2 The Reserve
Similarly, Plaintiffs challenge KP's retention of the "reserve" funds. (Pls.' Post-Trial Mem. 23-24). They allege that KP is unjustified in its refusal to release the remaining balance, has improperly used the funds for its own litigation expense, and is holding the funds as leverage against the instant litigation.Id. Conversely, KP maintains that the reserve was properly set up and used for the payment of legitimate unforeseen liabilities that occurred after the September 2004 sale of Quaker Towers. (KP's Post-Trial Mem. 34.) Moreover, KP asserts that it properly did not distribute the "reserve" funds and has appropriately retained them according to the terms of the LP Agreement.Id.
The LP Agreement provided:
 "Any net excess in insurance proceeds, any net proceeds of mortgage refinancing, condemnation, interests in the property of the [P]artnership, and of sales of all or portions of the [P]artnership property or interest therein . . . shall, to the extent of any gain realized or loss incurred by reason thereof, be credited or charged, as the case may be, to the capital accounts of the partners (Limited and General). . . . To the extent that any such net proceeds are available for distribution such proceeds shall be distributed as provided in Section 21.4." See Pls.' Ex. 1 ¶ 10.
In addition to providing for the distribution of any sale proceeds or Partnership assets to the General Partner and Limited Partners, ¶ 21.4 states that the General Partner may set up any *Page 50 
reserves as it "may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the [P]artnership or of the General Partner arising out of or in connection with the [P]artnership." (Pls.' Ex. 1 ¶ 21.4.2.) Moreover, the balance of the reserves shall be distributed to the partners at the "expiration of such period as the General Partner shall deem advisable."Id.
Here, KP set aside a "reserve" fund of $348,265,86 to "provide funds as may be necessary for any contingent or unforeseen liabilities or obligations of the [P]artnership or of the General Partner arising out of or in connection with the Partnership (i.e. accounting fees, insurance deductibles, etc.)." See
Pls.' Ex. 5; Tr. 38-39. Although under the LP Agreement the distribution of reserve funds is in the discretion of the General Partner, the LP Agreement also provides that these funds are to be held only as is "reasonably necessary for any contingent or unforeseen liabilities or obligations."
Accordingly, since October 18, 2005, QTA had not received notice of, nor have there been, any additional unexpected Partnership expenses or liabilities. See Tr. 1014-16. In fact, Uritescu explicitly conceded that a reserve such as the one established after the sale of Quaker Towers would typically not be held "for more than a short period of time." Id. at 38-39. Uritescu explained that although it was "fair . . . to assume" that that all bills incidental to Quaker Towers had been received and paid, it was his understanding that the funds were being "held [by the General Partner] because of the pendency of [the instant] litigation."[57]Id.
As a result, where, as here, the LP Agreement provided that sale proceeds may be held in a reserve when "reasonably necessary for any contingent or unforeseen liabilities or obligations," *Page 51 
yet the General Partner continued to withhold the reserve funds more than five years after the last expense had been received and paid, the Court finds that the General Partner is liable for breach of contract.[58] The Court grants Plaintiffs' request for a full accounting of amounts due. Defendant shall pay to Plaintiffs their portion of the undistributed sale proceeds currently held in reserve, including a chargeback of any improper allocations and interest.
 D Attorney's Fees
It is well settled in Rhode Island that under the "American Rule," litigants are generally required to pay their own attorney's fees, absent statutory authority or contractual liability. Moore v.Ballard, 914 A.2d 487, 489 (R.I. 2007) (citing Eleazer v. TedReed Thermal, Inc., 576 A.2d 1217, 1221 (R.I. 1990)). This rule, however, is not without exception. See Blue Cross Blue Shieldof R.I. v. Najarian, 911 A.2d 706, 711 n. 5 (R.I. 2006) (citingChambers v. NASCO, Inc.,501 U.S. 32, 45, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)) (stating three specific circumstances courts have granted an exception: (1) pursuant to the "common fund exception," a court may award attorney's fees to the party whose litigation efforts directly benefited others; (2) a court may also assess attorney's fees as a sanction for willful disobedience of a court order; and (3) a court may award attorney's fees when a party has acted in bad faith or for oppressive reasons); see also Vincent v.Musone, 574 A.2d 1234, 1235 (1990) (affirming the Court's *Page 52 
inherent power to fashion appropriate remedies that "serve the ends of justice"). These exceptions are inapplicable to the instant matter.
Here, the LP Agreement did not provide for an award of attorney's fees. See Pls.' Ex. 1. Moreover, the Limited Partners are not entitled to attorney's fees under § 9-1-45. Section 9-1-45 provides that in a civil action arising from a breach of contract claim, a "court may award a reasonable attorney's fee to the prevailing party" where it "finds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party" or where it "renders a default judgment against the losing party." Sec. 9-1-45. Although the Court finds that KP breached its duty of loyalty and that the Limited Partners are entitled to an accounting of the partnership distributions and reserve owed to them, the Court concludes that there was not "a complete absence of a justiciable issue."See UXB Sand Gravel, Inc. v. Rosenfeld Concrete Corp.,641 A.2d 75, 80 (R.I. 1994) (reversing an award of fees under § 9-1-45, because the question of whether the statute of frauds was satisfied presented a justiciable issue); Kells v.Town of Lincoln, 874 A.2d 204, 216 (R.I. 2005) (finding that a justiciable issue existed and that even if there were a complete absence of a justiciable issue, the court has discretion as to whether or not to award attorney's fees). Accordingly, each party must bear its own attorney's fees, costs, and expenses.
 IV Conclusion
After due consideration of all the evidence, together with the arguments advanced by counsel at the hearing and in their memoranda, the Court denies KP's motion to strike Plaintiffs' expert testimony. Further, the Court finds that in light of KP's corporate alignment with PIC, the overlap of corporate officers, and the structure of KP's management of the *Page 53 
Package, KP breached its duty of undivided loyalty to QTA and the Limited Partners. Although KP established the fairness and reasonableness of the laundry income, the 2002 refinancing, and the operating expenses, the Court finds that KP failed to establish the fairness of PIC's purchase of the Recoll Note. As a result, the Court finds that KP breached its fiduciary duty of undivided loyalty, and therefore, the Plaintiffs are entitled to the difference between the price paid by PIC for the Recoll Note and the amount paid by QTA to extinguish it. Moreover, the Court finds that KP did not breach its duty of care. In light of the Court's determinations with respect to partnership distributions and the reserve, the Court finds that the Limited Partners are entitled to a full accounting of the partnership distributions and reserve to determine their portion of the amounts due, if any, under the LP Agreement, including interest and chargebacks where applicable. Furthermore, the Court denies the Limited Partners request for attorney's fees pursuant to § 9-1-45, and finds that each party must bear its own attorney's fees, costs, and expenses.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record. Counsel shall also arrange for a time to meet with the Court for the purpose of scheduling such further proceedings, if any, as may be appropriate under the circumstances.
[1] PIC and its subsidiaries own many of the properties managed by KP, and KP utilizes PIC employees to carry out the management of these properties. (Tr. 27.) KP, PIC, and various PIC subsidiaries and affiliates also share corporate officers: David R. Picerne was president of both PIC and KP, Robert M. Picerne was an executive vice president and secretary of both PIC and KP, and Ronald R.S. Picerne was chairman of both PIC and KP and a director of PIC.Id. at 18-20, 33-34; Pls.' Ex. 80. Additionally, Raymond Uritescu (Uritescu) served as executive vice president and treasurer of both KP and PIC, held offices in several other PIC-related entities, and is married to Donna Picerne, the daughter of Ronald R.S. Picerne. Id. KP, like other PIC subsidiaries, does not file separate tax returns. Id. at 849. Rather, PIC files a consolidated tax return that treats KP's gains and losses as belonging to PIC. Id. Among PIC's other subsidiaries and affiliated companies are Kelly Picerne Insurance Agency, Kelly Picerne Management Services, Kelly Picerne Furniture and Design Division, WebeConsulting, Inc., Starlight Communications Holding, Inc., and the Ronald R.S. Picerne Trust (Picerne Family Trust). See Pls.' Ex. 80.
[2] Plaintiffs Peter Vican, Theona Pascalides, and William Vican, Jr. inherited their interests from their father, William P. Vican, Sr. See Pls.' Ex. 4. Louise Durfee transferred her interest in QTA to Plaintiff Audubon Society of Rhode Island. Id.
Plaintiffs Nicholas Goluses, Jr. and Dena Patel inherited their father's interest in the Partnership. Id. After the commencement of this matter, Leon Cornell died, and his executor, Jeffrey Knisley, was duly substituted as a Plaintiff. Plaintiff David Friedman died following the completion of the trial in this matter, and his executors, Frances E. Friedman and Diane Ducoff, in their capacity as co-executors of his estate, have been substituted as Plaintiffs. See Oct. 29, 2009 Stipulated Order.
[3] The management fee included the cost of certain personnel responsible for oversight of Quaker Towers, but located at the Lambert Lind Highway corporate office. (Tr. 86.) Accounting and management personnel were among those included in the fee.Id.
[4] "Available net income" is defined as "the excess, if any, of (a) the net income of the [P]artnership for such year, over (b) all amounts paid or accrued in such year on account of the principal on mortgages and other indebtedness of the [P]artnership."Id. ¶ 9. "Net income" is defined as
 "the income or losses of the [P]artnership from the operation and management of the [P]artnership's property after all operating expenses incurred in connection with the [P]artnership business and all interest on all [P]artnership mortgages and other indebtedness have been paid or provided for, but before making any allowance for amortization or depreciation of the cost of any property of the [P]artnership." Id. ¶ 7.1.1.
[5] In addition to the Class A loans, the General Partner was required to "loan to the [P]artnership from time to time either before or after March 31, 1983, such additional amounts up to a maximum of $75,000 as [was] from time to time required to meet any annual operating deficit and any annual negative cash flow."See Pls.' Ex. 1 ¶ 11.3. These "Class B" loans were to be made without interest and were to remain outstanding until the dissolution of the Partnership, a mortgage refinancing, or other event as specified by the LP Agreement. Id.
[6] Despite the provisions of the Agreement, no Partnership distributions were made to the Limited Partners, except for the years 1987 and 2004. See Def.'s Ex. E. Additionally, the Limited Partners did not receive their shares of any 2002 available net income or refinancing proceeds. See Pls.' Exs. 9-12, 30-33; Tr. 143-45.
[7] In Rhode Island, the Uniform Partnership Act of 1914 (UPA) is codified at G.L. 1956 § 7-12-12 through § 7-12-55, and the Uniform Limited Partnership Act of 1976 (ULPA) is codified at G.L. 1956 § 7-13-1, et seq.
[8] Shady Oaks, Pilgrim Park, and Parkview Terrace are owned by limited partnerships in which KP or PIC held a partial ownership interest. (Tr. 423.) Maple Leaf, River Run, and Pleasant Hills are wholly owned by PIC or one of its affiliates. Id.
[9] In making these allocations, KP's head property manager would consider industry standards, a particular property's needs, and the needs of the rest of the Package, and then make a determination of how much of an employee's time should be apportioned to a particular property. (Tr. 98.)
[10] The Court notes that Quaker Towers comprised one-third of the units in the Package, and was allocated between 28% and 32% of the payroll costs for the years 1998-2004. (Tr. 576-77; Def.'s Ex. L.)
[11] Employee bonuses were paid to property managers, assistant property managers, and sometimes to leasing agents. (Tr. 104.) Bonuses paid to maintenance staff were considered a separate expense and paid by the property to which the employee was assigned.Id.
[12] The Court notes that there were three other trucks owned by properties within the Package. (Tr. 1246.) Although these trucks were used at Quaker Towers at various times for emergency snow removal, KP did not charge Quaker Towers for the use.Id.
[13] PIC charged QTA a fee for the computers that were located at Quaker Towers and utilized by employees assigned to other properties within the Package. (Tr. 72, 110-11.)
[14] Starlight was owned by Uritescu, John Picerne, Mike Dooley, and Steve Lynch. (Tr. 61.) This information was never disclosed to the Limited Partners. Id. at 62.
[15] The Promissory Note executed in connection with the BNE refinancing was executed on behalf of QTA by PIC. See Pls.' Ex. 17.
[16] For a detailed discussion, see Kate McDermott,Managing the Crisis: The FDIC and RTC Experience, 635 (August 1998),http://www.fdic.gov/bank/historical/managing/history2-08.pdf
(hereinafter, Managing the Crisis).
[17] In addition to its outstanding debt, QTA's audited financial statements for the years of 1990 through 1998 indicate that the Partnership was a "Going Concern." See Pls.' Ex. 6. A "Going Concern" notation indicates to readers of such statements — including prospective lenders — that a property and borrower are having difficulty meeting their obligations and it raises concern about their ability to make mortgage payments. (Tr. 1043-46.) QTA's financial statements indicated that "[m]anagement [had] reduced certain operating costs of the Partnership[,] but advances from its [General Partner were] required to meet Partnership obligations as they [came] due." Id. The statements also forecasted that the Partnership would continue to experience cash flow deficiencies. Id.
[18] Essentially, the refinancing occurred in accordance with a concept known as "good bank and bad bank." (Tr. 969-72.) Fleet, as the good bank, approved Quaker Towers for a loan up to the maximum amount the Property's cash flow could support, and the balance of the debt remained with the FDIC and was managed by Recoll, the bad bank. Id.
[19] QTA's mortgage was refinanced as part of a bundled transaction involving BNE loans relating to at least twelve different KP and PIC properties and totaling approximately $14,750,000. See Pls.' Exs. 18-21. Although he signed the Fleet note as an officer of KP, Uritescu signed the contemporaneous Recoll note modification agreements as an officer of PIC, representing PIC to be the general partner of QTA. See Pls.' Exs. 19-20.
[20] Although QTA's audited financial statements initially disclosed that an affiliate of KP was negotiating to purchase the Recoll Note, and subsequent financial statements disclosed that an affiliate had purchased the Recoll Note, no other information regarding the transaction was disclosed. See Pls.' Ex. 6; Tr. 125. In preparing its initial bid, QTA's financial information was used in order to "size the debt" or understand how much debt the Partnership could absorb and how much PIC should bid. (Tr. 996-98.) At the time, based on its cash flow, PIC realized that the Property could not handle $1,070,000 in debt.Id.
[21] PIC used it own money to acquire the note; neither KP nor the Partnership's funds were used. (Tr. 978.) The Court notes that the Non-Recourse Assignment Agreement and other loan documents executed in connection with the 1992 refinancing and the purchase of the Recoll Note were executed by Uritescu as Executive Vice President of PIC. See Pls.' Ex. 18-20, 23-24, 26. Not only was Uritescu on both sides of the note modification agreements executed between QTA and PIC in November 1996 and July 2002, but these documents were also never disclosed to the Limited Partners.See Pls.' Ex. 24 25; Tr. 125. These documents set the interest rate for and extended the term of the Recoll Note that had been purchased by PIC.
[22] Under the original terms of the note, the interest rate was prime plus two percent starting in January 1995 and prime plus three percent starting in January 1996. (Tr. 979-80.) Additionally, PIC did not compound any interest related to this note.Id.
[23] The Recoll Note was not refinanced as part of the July 2002 refinancing.
[24] Although the December 23, 2002 Promissory Note was executed by Uritescu as an officer of the general partner, KP, the commitment letter provided by Citizens to QTA was executed by Uritescu as an officer of "G.P. PIC." See Pls.' Exs. 30 32.
[25] After closing costs, approximately $64,000 was left for distribution or repairs as a result of this transaction.See Pls.' Ex. 33.
[26] At the time the Property was listed for sale it suffered from "deferred maintenance" issues. (Tr. 167.) In fact, the Property needed exterior painting, the pool was non-operational, the steel supports for the exterior stairs and walkways were rusted-out, there were plumbing problems, and many of the apartments still had original fixtures and finishes. Id. 167, 1210-11, 1239-40; Pls.' Ex. 54.
[27] The last [P]artnership contingencies were paid out of this reserve on October 18, 2005, and there have been no other unexpected expenses incurred since then. (Tr. 1014-16.) These reserve funds have yet to be distributed and are being held pending the outcome of the instant matter. See Pls.' Ex. 36; Tr. 39. As of October 2005, $285,353.97 remained of the $348,265.86 originally withheld. (Pls.' Exs. 5 40.)
[28] The trial justice's gatekeeping obligation set out inDaubert applies not only to scientific testimony, but to all expert testimony. Kumho Tire Co., Ltd. v. Carmichael,526 U.S. 137, 141, 119 S. Ct. 1167, 1171 (1999) (concluding that the trial justice's role of "gatekeeper" established byDaubert applies alike to scientific testimony, technical testimony, and testimony based on other specialized knowledge).
[29] Our Supreme Court has recognized the applicability ofDaubert in cases involving Rule 702 of the Rhode Island Rules of Evidence. See DiPetrillo v. Dow Chem. Co.,729 A.2d 677, 685-86 (R.I. 1999); Gallucci v. Humbyrd,709 A.2d 1059, 1064 (R.I. 1998).
[30] All citations to "KP's Post-Trial Mem." refer to Kelly Picerne's Requested Findings of Fact and Argument. All citations to "KP's Reply Mem." refer to Kelly Picerne's Reply Memorandum in Support of its Requested Findings of Fact and Argument.
[31] KP asks this Court to find that Andolfo and Doyle's testimony lacked credibility and reliability based on certain statements made by Plaintiffs' counsel. See KP's Post-Trial Mem. 84, 88; Tr. 768. However, the Court finds that counsel's request that Ryan revise his analysis was merely a response to KP's challenges to the testimony and was a precautionary alternative in the event that the Court actually excluded any part of Andolfo or Doyle's testimony. See Pls.' Post-Trial Reply Mem. 16; see also Tr. 810.
[32] In reaching this conclusion, the Court acknowledges the various ethical standards applicable to an accountant acting in an "attestation" role when performing an audit or certifying financial statements and in a "non-attestation" role when testifying as an expert. See Tr. 824-27.
[33] The Court notes that in denying KP's motion to strike Plaintiffs' expert testimony it recognizes the experts' right to testify, however, the Court reserves the right to accord it the probative value it deems appropriate. See Beaton v. Malouin,845 A.2d 298, 302 (R.I. 2004) (stating that the task of assigning weight, if any, to the opinion of an expert witness, is reserved for the factfinder); DiPetrillo, 729 A.2d at 689-90 (stating that "once an expert has shown that the methodology or principle underlying his or her testimony is scientifically valid and that it `fits' an issue in the case, the expert's testimony should be put to the trier of fact to determine how much weight to accord the evidence"); Kyle v. Pawtucket Redevelopment Agency,106 R.I. 670, 673, 262 A.2d 636, 637-38 (R.I. 1970) (stating that it is the duty of the factfinder to examine and consider the testimony of every witness — expert and non-expert alike — and to grant that testimony only such weight as the evidence considered as a whole and the proper inferences therefrom reasonably warrant).
[34] In the past, when there has been a dearth of Rhode Island corporate law, our Courts have looked to Delaware for fiduciary legal principles. See e.g., Bove v. Community Hotel Corp.of Newport, R.I., 105 R.I. 36, 41-42, 249 A.2d 89, 93 (R.I. 1969) (stating that in the area of corporate law, Delaware case law is a valuable tool for Rhode Island courts to utilize).
[35] As an initial matter, the Court notes that the corporate general partner and directors of a general partner in a limited partnership "are entitled to the protections afforded corporate directors, including a presumption that their actions are protected from judicial oversight by the business judgment rule."Zoren v. Genesis Energy, L.P.,836 A.2d 521, 528 (Del. Ch. 2003). `The business judgment rule generally protects the actions of general partners, affording them a presumption that they acted on an informed basis and in the honest belief that they acted in the best interests of the partnership and the limited partners.' Id. (quotingIn re Boston Celtics Ltd. P'ship S'holders Litig., No. 16511, 1999 WL 641902, at *4 (Del. Ch. Aug. 6, 1999)). A plaintiff can rebut the presumption by proving that the fiduciary — in reaching a challenged decision — has violated one of its triad of fiduciary duties: due care, loyalty, or good faith.See Emerald Partners v. Berlin, 787 A.2d 85, 91 (Del. 2001);Seaford Funding, L.P. v. M M Assocs. II, L.P.,672 A.2d 66, 70 (Del. Ch. 1995) (citing Aronson v. Lewis,473 A.2d 805, 812 (Del. 1984)) (stating that the business judgment rule can only be claimed by a disinterested director, not one who appears on both sides of a transaction, or who plans to derive personal financial benefit from a transaction);Aronson, 473 A.2d at 813 (stating that the business judgment rule does not apply when officers "have either abdicated their functions, or absent a conscious decision, failed to act").
[36] This duty is often compared to that of corporate directors.Boxer, 429 A.2d at 997 (quoting Miller v. Schweickart,405 F. Supp. 366, 369 (S.D.N.Y 1975) (stating that the fiduciary duty of a general partner to a limited partner is no less than that of corporate directors, requiring good faith, loyalty, and care)). Some courts have held that in a limited partnership, the fiduciary duties owed by the general partner to the limited partner are more stringent than those of a general partner in a standard general partnership. See Palmer v. Fuqua,641 F.2d 1146, 1155 (5th Cir. 1981) (stating that since general partners in a limited partnership typically have the exclusive power and authority to control and mange the partnership, they owe the limited partners an even greater fiduciary duty than is imposed on general partners in a typical general partnership); see also
Alan R. Bromberg Larry E. Ribstein, OnPartnership § 16.07(b) (2008). Additionally, other courts have held that because partners are "[c]lothed with the power of controlling the property and managing the affairs" they are "liable as trustees." Pouzzner v. Westerly Theatre Operating Co.,67 F. Supp. 874, 881 (D.R.I. 1946); Bardis v. Oates,199 Cal. App. 4th 1, 12, 14 Cal. Rptr. 3d 89, 97 (Cal. Ct. App. 2004) (stating that because a partnership is a fiduciary relationship, "partners are held to the standards and duties of a trustee in their dealing with each other" and may not obtain any advantage over another partner "by the slightest misrepresentation, concealment, threat or adverse pressure of any kind"); Crenshaw v.Swenson, 611 S.W.2d 866, 890 (Tex. Civ. App. 1980) (noting that where a general partner of a limited partnership acts with complete control he stands in the same position to the limited partners as a trustee stands to the beneficiary of a trust);Ebest v. Bruce, 734 S.W.2d 915 (Mo. App. 1987). The Supreme Court of Delaware explained that while a corporate officer or director is not technically a trustee,
 "[he] stands in a fiduciary relation to the corporation and its stockholders. [P]ublic policy . . . has established a rule that demands [from him] . . . the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage. . . ." Guth v. Loft, Inc., 23 Del. Ch. 255, 270, 5 A.2d 503, 510 (1939).
[37] See supra note 8.
[38] The common management personnel of KP, PIC, and the various other affiliated companies included Uritescu, who was executive vice president and treasurer of both KP and PIC; Ronald R.S. Picerne, who was chairman of both KP and PIC; and his sons David R. Picerne and Robert M. Picerne, who were officers of both KP and PIC.See Tr. 18-20; 33-34; Pls.' Ex. 80.
[39] The Court notes that KP is bound by the acts and omissions of its officers, agents, and employees. See Brimbau v. AusdaleEquip. Rental Corp., 440 A.2d 1292, 1295 (R.I. 1982) (stating that a corporation acts only through its officers, agents, and employees, who in turn bind the corporation by the acts they commit or the knowledge they obtain when furthering the business of the corporation); Holmes v. Bateson,583 F.2d 542, 560 (1st Cir. 1978) (citingCyr v. B. Offen Co., Inc., 501 F.2d 1145 (1st Cir. 1974)) (stating that one of the cornerstones of corporate law is that a corporation is responsible for the acts and omissions of its agents, officers, and employees who are the only means by which it can conduct its affairs).
[40] Although Plaintiffs allege that there were additional transactions with other PIC subsidiaries, including Kelly Picerne Insurance Agency, Kelly Picerne Management Services, and PIC's Furniture and Design Division, Plaintiffs were not able to quantify and do not claim damages resulting from such dealings. See Pls.' Post-Trial Reply Mem. 6 n. 1.
[41] As a result of the Court's determination that KP breached its duty of undivided loyalty to QTA and the Limited Partners, KP is not protected by the presumptions of the business judgment rule. See supra note 35. Additionally, the terms of the LP Agreement do not protect the General Partners from breaches of fiduciary duty. Although the LP Agreement granted KP broad management power and limited its liability with regards to acts performed within the scope of the authority conferred by the LP Agreement, fiduciary breaches fall outside KP's contractual authority and the provisions cannot be interpreted to nullify KP's fiduciary duty. See Wartski v. Bedford,926 F.2d 11, 20 (1st Cir. 1991) (stating that a partner's fiduciary duty is an integral part of partnership agreement and cannot be negated by words of partnership agreement); Tucker Anthony RealtyCorp. v. Schlesinger, 888 F.2d 969, 974 (2d Cir. 1989) (stating that attempts by general partners to limit their fiduciary duties through the partnership agreement will be strictly construed against them); Konover, 228 Conn. at 226, 635 A.2d at 808 (affirming that terms of a limited partnership agreement cannot negate a general partner's fiduciary duty); Labovitz v. Dolan,189 Ill. App. 3d 403, 406, 545 N.E.2d 304, 310 (Ill. App. Ct. 1989) (stating that the general partner had breached its fiduciary duty because the duty existed concurrently with obligations set forth in the partnership agreement and could not be destroyed by the terms of the agreement).
[42] Under the terms of the LP Agreement, KP reserved the right to engage in "any other business or investment, including the ownership of or investment in real estate and the operation and management of real estate." See Pls.' Ex. 1 ¶ 15.2. Although this provision may have reserved KP's right to engage in the purchase of the Recoll Note, at a minimum, the provision did not waive KP's duty to fully and timely disclose the opportunity to QTA and the Limited Partners.
[43] The corporate opportunity doctrine is rooted in the principle that corporate directors and officers are bound by their duty of loyalty to subordinate their self-interests to the well-being of the corporation. Demoulas, 424 Mass. at 529, 677 N.E.2d at 180. In Rhode Island, "this legal doctrine prohibits a corporate fiduciary from diverting a business opportunity away from the corporation" and requires that a plaintiff demonstrate "that the defendant was a corporate fiduciary and that he or she diverted a corporate opportunity." A. Teixeira Co. v. Teixeira,699 A.2d 1383, 1386 (R.I. 1997). Defendant asserts that Plaintiffs cannot prevail on their claim because the Partnership did not have the ability to pay off or buy-back the Recoll Note at the time of PIC's acquisition. See KP's Post-Trial Mem. 61. While this Court recognizes that in its majority opinion in Teixeira, our Supreme Court required that the plaintiff have been financially able to avail itself of the opportunity, the Court also recognizes that Justice Flanders in his dissent stated that he did not "believe that a self-dealing fiduciary like [defendant] should be able to consummate such a transaction for his own account merely because in his estimation the opportunity is one that the corporation . . . [does not] have the financial ability to obtain."Teixeira, 699 A.2d at 1388-89. In fact, other courts have agreed with Justice Flanders in his opinion that the existence of an impediment to the corporation's ability to make use of the opportunity does not excuse the failure of a fiduciary to disclose the opportunity. See Meinhard,249 N.Y. at 465, 164 N.E. at 547 (stating "[n]o answer is it to say that the chance would have been of little value even if seasonably offered"); Demoulas,424 Mass. at 534-35, 677 N.E.2d at 181-83 (stating that the duty of loyalty requires that opportunities must be presented to the corporation without regard to possible impediments, and material facts must be fully disclosed); Durfee v.Durfee Canning,323 Mass. 187, 200-01, 80 N.E.2d 522, 530 (1948). Moreover, KP has neither addressed the Limited Partners' ability to avail themselves of the opportunity, nor has it sufficiently established QTA's "financial inability" or actual insolvency. See Norman v.Elkin, 617 F. Supp.2d 303, 312-13 (D. Del. 2009) (stating that a defendant faces a significant burden in establishing that a corporation was financially unable to take advantage of a corporate opportunity). In fact, "mere technical insolvency, such as inability to pay current bills when due or mere inability to secure credit, will not suffice." See General Video Corp. v. Kertesz, No. 1922-VCL, 2008 WL 5247120, at *19 (Del. Ch. Dec. 17, 2008) (citing Sterianou ex rel. Stephanis v. Yiannatsis, No. 1508, 1993 WL 437487, at *4 (Del. Ch. Oct. 4, 1993)) (stating that the fiduciary must establish that such financial inability amounted to insolvency to the point where the corporation is practically defunct); see also 18B Am. Jur. 2d Corporations § 1553 (2010).
[44] The Court is similarly unconvinced that the risk assumed by PIC in purchasing the Recoll Note or in guaranteeing QTA's debt obligations, relieves or absolves KP of its fiduciary duties to QTA or the Limited Partners. See KP's Post-Trial Mem. 62. Likewise, the Court declines to find that the purchase of the Recoll Note was fair simply because PIC did not change its terms.Id. Although PIC did not detrimentally alter QTA's obligations after purchasing the Recoll Note, given QTA's inability to continue servicing the note, it would have been in QTA's best interest to acquire it, or to at least have been given the opportunity to compete for the opportunity. See Ebest, 734 S.W.2d at 922. Therefore, the Court finds that KP allowed PIC to realize a gain which could have belonged to QTA. Id.
[45] As previously indicated, the terms of the LP Agreement do not protect the General Partners for breaches of fiduciary duty. Despite KP's broad management power and the LP Agreement's limitations on its liability, fiduciary breaches fall outside KP's contractual authority and the provisions cannot be interpreted to nullify KP's fiduciary duty. See supra note 41.
[46] The Court also notes that Mac-Gray's laundry income may have been inflated due to the installation of a laundry card system at the Property in 2005 which required tenants to initially purchase laundry cards before using the laundry machines. (Tr. 528-29.)
[47] The Court notes that QTA's audited financial statements indicated in the notes that each year the "General Partner [was] reimbursed for payroll and related costs of project personnel."See Pls.' Ex. 6.
[48] Moreover, the Court finds that the staffing levels maintained at Quaker Towers were appropriate and may have actually been the "minimum staff that would [keep Quaker Towers] functional." (Tr. 1322-23, 1327, 1333-34.) While, the current manager at Quaker Towers maintains two office staff, two full time maintenance people, and a half-time leasing assistant during the summer, before its sale in 2004, KP operated Quaker Towers with the equivalent of only three to four employees. Id. at 1321; Pls.' Ex. 41. The Court notes that there are circumstances in which it would be necessary and reasonable for more than three full-time equivalents to be required to manage, maintain, and lease-out apartments at Quaker Towers. Additionally, employee apartments are a legitimate management expense that provided numerous benefits to Quaker Towers.Id. at 581-84, 1323-24.
[49] Although KP failed to disclose that it contracted with Starlight for cable television services and WebeConsulting for IT services — in both of which Uritescu owned substantial shares — the Court is satisfied that these transactions were entirely fair and did not result in harm to QTA or the Limited Partners.
[50] Although the truck was used in emergencies at other properties within the Package, trucks owned by other properties were similarly used at Quaker Towers, and KP did not charge Quaker Towers for this occasional use. (Tr. 1214, 1245-46.)
[51] "Utmost care" is defined as "great care . . . [t]he degree of care exercised in a given situation by someone in the business or profession of dealing with the situation."Black's Law Dictionary 240 (9th ed. 2009).
[52] Despite KP's assertions, it does not appear that Plaintiffs challenge the sale of Quaker Towers in 2004. (KP's Post-Trial Mem. 15-17, 64-65.) While Plaintiffs do allege that the Property could have been sold for more had it been maintained in accordance with KP's duty of care, they do not appear to challenge the fairness of the transaction given the condition of the Property at the time of the sale. The Court does note that the Property was fully and fairly exposed to the marketplace by Marcus Millichap, an unaffiliated real estate broker, and that the actual sale price of $6,200,000 meets all the requirements of fair market value. (Tr. 342-47.)
[53] See supra note 26.
[54] The Court notes that under the ULPA
 "[a] limited partnership shall not make a distribution to a partner to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited partnership, other than liabilities to partners on account of their partnership interests and liabilities for which the recourse of creditors is limited to specified property of the limited partnership, exceed the fair value of the assets of the limited partnership, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the limited partnership only to the extent that the fair value of that property exceeds that liability." Sec. 7-13-37.
Under limited partnership law, a claim of breach of fiduciary duty must first be analyzed in terms of the partnership agreement, which is the operative governing instrument, and only where that document is silent or ambiguous, or where principles of equity are implicated, will a court begin to look for guidance from the statutory default rules, traditional notions of fiduciary duties, or other extrinsic evidence. Sonet v. Timber Co., L.P.,722 A.2d 319, 324 (Del. Ch. 1998).
[55] "Net income" is defined as follows:
 "[T]he income or losses of the [P]artnership from the operation and management of the [P]artnership's property after all operating expenses incurred in connection with the [P]artnership business and all interest on all [P]artnership mortgages and other indebtedness have been paid or provided for, but before making any allowance for amortization or depreciation of the cost of any property of the [P]artnership." Id. ¶ 7.1.1.
Simply put, "net income" is the balance remaining after operating expenses and interest on QTA's mortgages and other indebtedness have been paid, but before accounting for amortization or depreciation of the cost of QTA's property.
[56] The Court notes that Defendant's own witness, William J. Piccerelli (Piccerelli), a certified public accountant, testified there was no language in the LP Agreement requiring that all liabilities of the Partnership be addressed before cash could be distributed under the "available net income" calculation.See Tr. 1189, 1193-94. In fact, Piccerelli explained that he arrived at his calculations by "relying on common sense business practice" instead of the clear and unambiguous language of the LP Agreement. Id. at 1189-90. Moreover, the Court finds KP's interpretation impermissible because it would render other language in the LP Agreement meaningless and superfluous.Andrukiewicz v. Andrukiewicz, 860 A.2d 235, 239 (R.I. 2004) (stating that a fundamental principle of contract interpretation requires that an interpretation that reduces certain words of a contract to mere surplusage should be rejected). Here, the LP Agreement explicitly states that annual distributions of available net income should be suspended so long as any "Class A" loans remain outstanding. See Pls.' Ex. 1 ¶¶ 9 11.2. However, if the Court was to follow KP's contention that the LP Agreement required that "other indebtedness of the [P]artnership" be repaid before any annual distribution of "available net income," the "Class A" language would be unnecessary as it would be subsumed within "other indebtedness."
[57] The Court notes that even Defendant's attorney, in a letter to Pliakas, stated that "[a]ny final distribution likely will be delayed until such time as this litigation is resolved."See Pls.' Ex. 36. Additionally, of the more than $60,000 spent since the creation of the "reserve" account, at least $10,000 has been used for services rendered by Ernst Young and legal counsel in connection with Plaintiffs' subpoena request. See KP's Post-Trial Mem. 34 n. 9; Tr. 1012.
[58] The Court also finds that by withholding the "reserve" funds, KP has breached its fiduciary duty of good faith to the Limited Partners. Twin Bridges Ltd. P'ship v. Draper, No. 2351-VCP,2007 WL 2744609, at *20 (Del. Ch. Sept. 14, 2007) (citingBoxer, 429 A.2d at 997) (stating that "[a] general partner in a limited partnership has a fiduciary duty to `exercise the utmost good faith' . . ."). Here, KP's refusal to release the "reserve" funds for the pendency of the instant litigation is in bad faith, particularly in light of the fact that no Partnership contingencies or obligations have been claimed since October 2005.